COAST–TO–COAST FINANCIAL
CORPORATION, et al.,
Plaintiffs,

v.

The UNITED STATES, Defendant.

Local America Bank of Tulsa,
et al., Plaintiffs,

v.

The United States, Defendant.

Centex Corporation, et al., Plaintiffs,

v.

The United States, Defendant.

First Heights Bank, FSB,
et al., Plaintiffs,

v.

The United States, Defendant.

First Nationwide Bank, FSB,
et al., Plaintiffs,

v.

The United States, Defendant.

Nos. 96–584C, 96–590, 96–811C,
96–494C and 95–525C.

United States Court of Federal Claims.

Jan. 19, 2000.

Melvin C. Garbow, Washington, D.C., for plaintiffs Coast–to–Coast Financial Corporation, et al.; Local America Bank of Tulsa, et al.; and Centex Corporation, et al.

Robert K. Huffman, Washington, D.C., for plaintiff First Heights Bank, FSB, et al.

Harry M. Reasoner, Washington, D.C., for plaintiff First Nationwide Bank, et al.

Kenneth M. Kulak, with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, and Deputy Director Jeanne E. Davidson, Washington, D.C., for defendant.

## ORDER

BRUGGINK, Judge.

These contract claims are before the court on a number of discovery-related disputes, prompted in part by the Government's view that the matter is ripe for summary judgment without further discovery. The claims all arise out of the savings and loan crisis of the early 1980s. They are part of the *"Winstar"* series of cases.[1] They are not consolidated, but they have been transferred as a group to this judge for the limited purpose of minimizing duplicative briefing on potentially common legal questions and coordinating discovery to the extent practicable.

Pending is defendant's March 16, 1999 motion for summary judgment on First Heights' "tax benefit" claim, to which plaintiff First Heights on May 21, 1999 filed a response seeking discovery pursuant to RCFC 56(g). Also pending are plaintiff First Heights' September 24, 1999 motion to compel discovery and defendant's September 3, 1999 motion to stay discovery in docket numbers 96–525C, 96–548C, 96–949C and 96–590C, involving plaintiffs other than First Heights. The latter two discovery motions are fully briefed. Plaintiffs Coast–to–Coast, Local America, and Centex Corporation (the *"C–L–C"* plaintiffs) have filed a motion for leave to serve requests for admission, which is also fully briefed. In addition, on September 29, 1999, all five plaintiffs filed a joint motion to extend discovery beyond the existing September 30, 1999 deadline.

### The Nature of Plaintiffs' Claims

The crisis in the savings and loan industry in the 1980's prompted the federal govern-

---

1. *See Winstar Corp. v. United States.*, 21 Cl.Ct. 112 (1990), *aff'd*, 64 F.3d 1531 (Fed.Cir.1995), *aff'd, United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

ment, acting through the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC"), to enter into long-term assistance agreements with various financial institutions and private investment groups. The institutions and investors purchased the assets and assumed the liabilities of failing thrifts. In turn, the agencies offered certain benefits to the acquirers. The benefit alleged by the plaintiffs here relates to reimbursement for what are known as "covered asset losses." In general, the covered asset loss was equal to the difference between the value of a covered asset as shown on the books of a failed thrift, and the proceeds that an acquirer received from the sale of that asset. These actions are brought by banks who acquired failing thrifts pursuant to acquisition agreements with the FHLBB and FSLIC. The acquiring banks claim that their contracts with the agencies promised the right to take certain tax deductions associated with covered asset losses, and that these "tax benefits" were an important part of the consideration offered to induce plaintiffs to take over failing thrifts.

Specifically, the complaints allege that at the time these agreements between the agencies and the acquirers were made, acquirers were able to take a tax deduction for the loss associated with selling a covered asset for less than its book value, even though this loss was reimbursed through cash assistance from FSLIC. According to plaintiffs, concern about these tax deductions prompted the Treasury Department in 1991 to issue a report indicating that there was uncertainty as to whether covered asset loss deductions were actually authorized under the existing law. It recommended that Congress "clarify" through legislation that these deductions for covered asset losses were not available. Congress held hearings on the issue, and in August 1993 passed legislation stating that, for purposes of determining whether there has been a loss on the disposition of an asset, a taxpayer must take into account any FSLIC or FDIC assistance payments received as compensation for the loss. This legislation was included in a provision of the Omnibus Budget Reconciliation Act of 1993, and was entitled "Clarification of Treatment of Certain FSLIC Financial Assistance." *See* Pub.L. No. 103–66, § 13224, 107 Stat. 485 (1993). Hearings on this legislation were presided over by Rep. Frank J. Guarini, and it is referred to hereafter as "the Guarini legislation."

Plaintiffs allege that the Government breached their contracts by passing the Guarini legislation, which disallowed covered asset loss deductions. They seek damages said to have resulted from this alleged breach.

*Evolution of the Pending Motions*

These cases were transferred to this judge on January 9, 1998, after common discovery was made available to all the *"Winstar"* plaintiffs. On March 16, 1999, the Government filed a motion for summary judgment directed only at First Heights, asserting that the record was sufficient to address all of First Heights' tax benefit claims. Later, on September 3, 1999, it sought an order staying discovery in the other cases.

Four of the five plaintiffs filed a motion to compel on May 22, 1999.[2] Following the June 1999 hearing on the plaintiffs' motion to compel, and at the court's suggestion, First Heights took steps to narrow its discovery request by compiling a reduced list of documents that it asserted it needed in order to respond to the Government's summary judgment motion. The narrowed request was broken into four categories, each of which listed various documents identified in the Government's affidavits and privilege logs as responsive to the plaintiffs' original joint discovery request. This narrowed request was provided to the Government in an August 1999 letter sent by First Heights. The list of documents comprising First Heights' narrowed discovery request is reproduced in Attachments 1–4 to Exhibit A of defendant's September 3, 1999 motion to stay discovery. The parties refer to these documents throughout their briefing as the Category 1, Category 2, Category 3 and Category 4 documents, respectively, and the court adopts these classifications for purposes of this or-

---

**2.** First Nationwide filed a separate motion to compel on May 24, 1999.

der.[3] On September 24, 1999, First Heights' filed its motion to compel discovery on the narrowed list of documents. On September 29, 1999 all plaintiffs moved to extend the current discovery cutoff, and on October 15, 1999, the *C–L–C* plaintiffs filed their motion for leave to serve requests for admission. All of these procedural motions are fully briefed, and argument is deemed unnecessary.

## DISCUSSION

*First Heights' motion to compel*

The Government argues that the documents sought by First Heights in its September 24, 1999 motion to compel are irrelevant as a matter of law to the issues raised in its summary judgment motion. That motion offers a number of defenses against First Heights' claims, including (1) that the contract between First Heights and the Government (the "Assistance Agreement") does not contain any promise regarding the deductibility of covered asset losses; (2) that the alleged promise regarding deductions for covered asset losses would involve a waiver of sovereign power by the Government, and therefore cannot be enforced absent unmistakable language in the contract supporting its existence; (3) that even if First Heights was initially permitted to deduct covered asset losses, First Heights also assumed the risk of a subsequent change in the law; (4) that any promise in the Assistance Agreement relating to covered asset loss deductions was given without authority, because the contracting agencies were not acting under the supervision of the Secretary of the Treasury, as required by 26 U.S.C. § 7801 (1994); and (5) that any promise to First Heights regarding covered asset loss deductions is unenforceable because it is not contained in a signed "closing agreement" pursuant to 26 U.S.C. § 7121 (1994).

In its response to First Heights' motion to compel, the Government also asserts various privilege claims. The court has considered the Government's relevance objections to First Heights' Category 1 and 2 requests,

and finds them lacking. For the reasons which follow, the court is thus prepared to order the production of the Category 1 and 2 documents for *in camera* review, in order to facilitate an accurate assessment of the Government's privilege assertions.

As to the Category 3 and 4 documents, the parties present numerous arguments relating to the potential relevance, or lack thereof, of these materials. Although some of First Heights' proffered justifications for the relevance of these documents may lack merit, nearly all of the documents in these two categories can serve more than one purpose, in that they may relate to one or more of the Government's proffered defenses. The court, therefore, denies the Government's comprehensive relevance objections to production of the Category 3 and 4 documents. The court hopes and expects that it will be able to resolve the disputes over the Government's privilege claims for these documents without reviewing them *in camera*. To the extent that privilege claims remain unresolved after consideration of the parties' briefing, however, the court is also prepared to order production of appropriate documents in Categories 3 and 4 for *in camera* review. Once the court has completed its review of the Government's privilege claims, the Government will be ordered to produce any non-privileged materials in Categories 1–4 for First Heights. Accordingly, plaintiff First Heights' motion to compel is granted in part and denied in part, as explained below.

■ "Category 1" of First Heights' narrowed discovery request consists of various documents identified in the Government's privilege logs, addressing the standard Assistance Agreement provisions or proposal instructions. Most of these documents are contemporaneous with the execution of the Assistance Agreements between the thrift acquirers and the Government, and relate primarily to determining what the terms of the agreements actually were. First Heights seeks these documents in connection with its efforts to respond to defendant's summary

**3.** The contents of each category are described in the court's discussion on First Heights' motion to compel.

judgment motion, which asserts that the plain language of the Assistance Agreement between First Heights and the Government does not include a promise to permit deduction of covered asset losses irrespective of the receipt of FSLIC financial assistance. The Government also argues that the integration clause of the Assistance Agreement cannot be read to permit the incorporation of the Request for Proposals ("RFP") sent by the Government to potential thrift acquirers, which arguably contained language supporting First Heights' asserted right to deduct covered asset losses.

The integration clause found at § 27 of the Assistance Agreement provides that it is the entire agreement and supersedes all prior agreements between the parties, "excepting only the Acquisition Agreements and any resolutions or letters concerning the Transaction or this Agreement issued by the Bank Board or the CORPORATION in connection with the approval of the Transaction of this Agreement[.]" The clause states that the incorporated resolutions and letters are trumped by the Assistance Agreement to the extent that there is any "conflict, variance or inconsistency." The Government argues that any promise regarding the deductibility of covered asset losses would be in conflict with the Assistance Agreement, and thus First Heights' requested discovery regarding the integration of documents such as the RFP is irrelevant.

The Assistance Agreement, however, does not appear, at first blush, to contain language that would necessarily negate a promise regarding the deductibility of covered asset losses. First Heights is thus entitled to discovery to determine whether particular documents, including the RFP, are among the "resolutions or letters" that the integration clause incorporates into the final Assistance Agreement. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434 (Fed.Cir. 1996) (noting that courts must give effect to extrinsic documents incorporated into a contract through an integration clause) (citing *United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 2448–53, 135 L.Ed.2d 964 (1996)); *Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 458 F.2d 994, 1005 (1972) (holding that extrinsic evidence of surrounding circumstances should be considered in the course of interpreting ambiguous or uncertain contractual terms).

■ Category 2 of First Heights' narrowed discovery request includes "documents identified on defendant's privilege logs that address the deductibility of covered asset losses and/or IRC section 597 and that were written by, to, or about communications with certain IRS officials who participated in the First Heights transaction or other FSLIC-assisted transactions." First Heights argues they are made relevant, among other reasons, by the Government's argument in its motion for summary judgment that the FHLBB and FSLIC lacked authority to bind the Government to tax deductions for covered asset losses. The Government relies on 26 U.S.C. § 7801, which indicates that "except as otherwise expressly provided by law, the administration and enforcement of [the Internal Revenue Code] shall be performed by or under the supervision of the Secretary of the Treasury."

First Heights is justified in seeking discovery in connection with the Government's § 7801 defense. First Heights alleges that "IRS officials coordinated with FSLIC and the FHLBB to such a degree that the representations and commitments made to acquirers regarding the deductibility of covered asset losses were being performed by or under the supervision of the Treasury for purposes of Section 7801." The Category 2 documents are thus potentially relevant to buttress First Heights' contention that IRS involvement in the transactions that are the source of the alleged promises regarding tax benefits was sufficient to satisfy the requirements of § 7801.

The Government also argues that signed "closing agreements" pursuant to 26 U.S.C. § 7121 are the only mechanism for binding the government in connection with promised tax treatment. Although the issue has not been fully briefed by the parties, the court's preliminary examination of the cases dealing with closing agreements suggests that such agreements are used in dealing with settlement of specific tax disputes that are pending administratively. *See, e.g., United States v.*

*Hardy,* 299 F.2d 600, 605–06 (4th Cir.1962); *Unita Livestock Corp. v. United States,* 355 F.2d 761, 765 (10th Cir.1966). The dispute here would appear to arise in a different context. What are alleged are contractual promises of specific treatment of certain future deductions. Nor does Section 7121 appear to claim to be the exclusive mechanism for reaching agreement on the future treatment of tax deductions.

Category 3 of First Heights' narrowed discovery request consists of documents that were written by or to government officials, other than the IRS officials identified in Category 2, and that address the deductibility of covered asset losses in connection with the 1988–89 FSLIC-assisted thrift acquisitions. Unlike many of the documents in Categories 1 and 2, the majority of the Category 3 documents are not contemporaneous with the execution of the 1988 Assistance Agreements. First Heights argues that different documents in Category 3 are relevant to at least three different issues raised by the Government's motion, and so Category 3 is in effect composed of three "sub-categories" of documents. First Heights filed a revised 56(g) affidavit, along with exhibits, on November 2, 1999. Exhibit N to the revised affidavit identifies for each Category 3 document the issue or issues raised in the Government's summary judgment motion to which the document supposedly relates.

■ The first "sub-category" in Category 3 encompasses those documents identified in Exhibit N as relating to the "authority" issue.[4] First Heights contends that these materials, like those in Category 2, are likely to address the government's § 7801 defense. The court agrees. These documents include various reports and memoranda authored by Treasury Department personnel and dealing with the tax treatment of FSLIC assistance and the tax implications of the Government's agreements with various thrift acquirers. Such documents are potentially relevant to determining whether Treasury Department involvement in the tax aspects of the thrift

transactions was extensive enough to justify a finding that any promise with regards to deductions of covered asset losses was made "under the supervision" of the Secretary of the Treasury pursuant to § 7801.

■ The second "sub-category" in Category 3 encompasses those documents identified in Exhibit N as relating to the "assumption of risk" issue. First Heights argues these materials are needed to rebut the Government's argument that First Heights assumed the risk of a subsequent "clarification" in the tax law regarding the deductibility of covered asset losses. The Government responds that the contract as written can only be construed as an assumption of risk by First Heights in connection with the possibility of a change in the tax laws. It argues that, as a matter of law, the views of federal officials on the deductibility of covered asset losses at the time of the thrift acquisitions are irrelevant, insisting that "it is well-established that the Federal tax laws and the Government's interpretation of Federal tax laws are subject to change." The government relies on *Dickman v. Commissioner,* 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984), which held that the Commissioner of Revenue was free to depart from a prior interpretation of the tax law and substitute a new interpretation that would be given retroactive effect, even where doing so could harm a plaintiff who had relied to his detriment on the prior interpretation. *Id.* at 343, 104 S.Ct. 1086 (citations omitted). *Dickman* and the cases cited therein are distinguishable, however, because the taxpayers there did not allege contractual promises of particular tax treatment.

In *First Heights,* contractual promises *are* alleged, and the parties do not cite to any language in the Assistance Agreement that expressly assigns the risk of a change in the law to either First Heights or the Government. The actions of the parties during the course of contract formation and performance, therefore, may provide guidance as to how the parties viewed the distribution of

---

4. The "authority issue" is First Heights' label for the Government's argument that any promise regarding the deductibility of covered asset losses was made without the authority of the Secretary

of the Treasury, as is required by 26 U.S.C. § 7801. *See supra* at 800–01 (discussing Government's § 7801 defense).

risks under the agreement, and so the Category 3 documents are relevant to the assumption of risk arguments raised by the Government. *See Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 427 F.2d 1233, 1240 (1970) ("The interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling weight."); *Jansen v. United States,* 170 Ct. Cl. 346, 344 F.2d 363, 369 (1965) ("It is a canon of construction that the interpretation placed by the parties upon a contract during its performance is demonstrative of their intention.").

The third "sub-category" in Category 3 encompasses those documents identified in exhibit N as relating to what First Heights describes as the "sovereign act" issue. The issues raised by the parties' arguments concerning these Category 3 "sovereign act" documents overlap issues raised in connection with Category 4. Category 4 consists of approximately 130 documents that relate to the revenue estimates prepared by the Department of the Treasury and/or the Joint Taxation Committee ("JTC") in connection with the Guarini legislation and predecessor bills. In its motion for summary judgment, the Government invokes the "unmistakability doctrine" as a defense against First Heights' claims. It argues that, as a matter of law, any alleged promise regarding a tax deduction constitutes a restriction on sovereign power, and so the existence of such a promise must be established in unmistakable terms to be enforceable. First Heights responds by arguing that both the Category 3 sovereign act documents and the Category 4 documents will show that the Government improperly "targeted" the tax benefits available to thrift acquirers, thus demonstrating that the Guarini legislation was not a sovereign act. This in turn, according to First Heights, would render the Government's unmistakability defense inapplicable. The issue raised by these conflicting views is whether consideration of the sovereign act and targeting analysis offered by First Heights is a condition precedent to evaluation of the Government's unmistakability defense.

■ The Federal Circuit has described the unmistakability doctrine as "a canon of construction that attempts to balance these two somewhat competing concepts [of sovereignty and its limits] by allowing the Government to make agreements that bind future Congresses, but only if those contracts contain an unmistakable promise." *Yankee Atomic Electric Co. v. United States,* 112 F.3d 1569, 1578 (Fed.Cir.1997). In describing when the unmistakability doctrine should be applied, the Supreme Court has stated that "The application of the doctrine thus turns on whether enforcement of the contractual obligation alleged would block the exercise of a *sovereign power* of the Government." *See Winstar,* 518 U.S. at 879, 116 S.Ct. 2432 (emphasis added). In defining "sovereign power" in turn, the Court emphasized that the unmistakability doctrine was not designed to protect efforts to target government contractors if the targeting would otherwise be improper. The Court stated:

"Sovereign power" as used here must be understood as a power that could otherwise affect the Government's obligations under the contract. The Government could not, for example, abrogate one of its contracts by a statute abrogating the enforceability of that contract, government contracts of a class including that one, or simply all government contracts. No such legislation would provide the Government with a defense under the sovereign acts doctrine[.]

*Id.* at 878–79, n. 22, 116 S.Ct. 2432. In other words, the *Winstar* plurality supports First Heights' argument that an inquiry into the alleged "targeted" nature of the Guarini legislation is relevant to determining whether the Government can take advantage of the unmistakability doctrine in the present case.

■ The Government, in support of its contention that the question of targeting is irrelevant in deciding whether the unmistakability doctrine should apply, relies heavily on the Court's statement in *Winstar* that "It would, of course, make good sense to apply the unmistakability rule if it was clear from the start that a contract plaintiff could not obtain the relief sought without effectively barring exercise of a sovereign power, as in

the example of the promisee of the tax exemption who claims a rebate." *Id.* at 880, n. 24, 116 S.Ct. 2432. The term "sovereign power" in this statement, however, is subject to the earlier definition quoted above. For an act of Congress to qualify as an exercise of sovereign power, it cannot have been designed merely to eliminate an obligation that arose under one of the Government's contractual relationships. *See id.* at 878–79, n. 22, 116 S.Ct. 2432.

■ The *Winstar* plurality's discussion of unmistakability and sovereign acts thus provides a road map for how analysis of claims alleging breach of contract by the Government ought to proceed. The first step is to determine whether, under ordinary rules of construction, the language of the contract supports a finding that the promise alleged by the plaintiff exists. *See id.* at 880, n. 24, 116 S.Ct. 2432 ("A contract may reasonably be read under normal rules of construction to contain a provision that does not satisfy the more demanding standard of unmistakable clarity. If an alleged term could not be discovered under normal standards, there would be no need for an unmistakability doctrine."). If no promise is found, the plaintiff's claim fails. If a promise is found, the court must then look to the act of Congress alleged to have breached the promise, and determine whether the act qualifies as a "sovereign act". *See id.* at 878–79, n. 22, 116 S.Ct. 2432; *Yankee Atomic,* 112 F.3d at 1579 (citing *Winstar,* and noting that "the plurality also expressly stated that application of the unmistakability doctrine turns on whether enforcement of the contractual obligation would effectively block the exercise of a sovereign power of the Government. *As explained above, the assessment at issue in the present case is a general, sovereign act.*") (citation omitted) (emphasis added). If the alleged breaching act is *not* found to have resulted from the exercise of "sovereign power," then a promise that is present under normal rules of construction may be enforceable, provided it included assurance that the benefit offered would be permanently available, or at least available for a specified period of time. If, on the other hand, the alleged breaching act *does* result from the exercise of sovereign power, then the unmis-

takability doctrine applies, and the Government will not be considered to have broken any promise to the contractor, unless the contractor shows that the agreement included an unmistakable guarantee of immunity from the effect of future generalized sovereign actions. *See Winstar,* 518 U.S. at 878, 116 S.Ct. 2432; *Yankee Atomic,* 112 F.3d at 1580.

In sum, because the Government's motion for summary judgment does not rely only on the defense of "no promise" under ordinary rules of construction, but instead invokes the additional defense of unmistakability, both the *Winstar* plurality and *Yankee Atomic* dictate that First Heights is entitled to claim that the Guarini legislation targeted its contract. The issue of unmistakability *vel non,* in other words, cannot be resolved in isolation from the question of whether the alleged breaching statute is a sovereign act. The Government's motion puts both at issue.

This approach is consistent with the views of the *Winstar* concurrence authored by Justice Scalia and joined by Justices Kennedy and Thomas. The concurrence views the unmistakability doctrine as a rule of presumed or implied-in-fact intent that has "little if any independent legal force beyond what would be dictated by normal principles of contract interpretation." *See Winstar,* 518 U.S. at 920, 116 S.Ct. 2432. The concurrence notes that it is generally reasonable to assume that the parties to a contract intend for liability to be imposed where one party takes an action which renders performance by itself or the other party impossible. *See id.* The concurrence goes on to describe its view of the unmistakability doctrine:

When the contracting party is the government, however, it is simply not reasonable to presume an intent of that sort. To the contrary, it is reasonable to presume (unless the opposite clearly appears) that the sovereign does not promise that none of its multifarious sovereign acts, needful for the public good, will *incidentally* disable it or the other party from performing one of the promised acts. The requirement of unmistakability embodies this reversal of the normal reasonable presumption. Govern-

ments do not ordinarily agree to curtail their sovereign or legislative powers, and contracts must be interpreted in a common-sense way against that background understanding.

*Id.* at 920–21, 116 S.Ct. 2432 (emphasis added).

Under this view, the inquiry into possible "targeting" by Congress is relevant to determining whether the alleged breach is merely an incidental effect of a sovereign act designed to promote the public good, or instead is a deliberate attempt by Congress to alter its previous bargain with the contractor. If the former, the parties are presumed to have intended that no liability attach to Congress's action (absent unmistakable language to the contrary). If the latter, however, the concurrence's "reverse-presumption" version of the unmistakability defense is not available, because it is not reasonable to presume that contractors intend for the Government to deliberately target the elimination of rights that would, under normal rules of construction, accrue to the contractor, particularly where the contract imposes an obligation of good faith and fair dealing on both parties. *See Barseback Kraft AB v. United States,* 36 Fed.Cl. 691, 706 (1996), *aff'd,* 121 F.3d 1475 (Fed.Cir.1997) (discussing role of good faith and fair dealing in fulfilling the reasonable expectations of the parties to a government contract).

As discussed above, both the *Winstar* plurality and Justice Scalia's *Winstar* concurrence support the conclusion that the alleged improper targeting of the Guarini legislation against government contractors is relevant to determining whether the Government can invoke the unmistakability doctrine. In terms of the present discovery dispute, therefore, the court must decide if the Category 3 and 4 documents requested by First Heights are relevant to the question of whether the Guarini legislation qualifies as a "sovereign act."

The process used in determining whether a particular action qualifies as a sovereign act involves "a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legisla-

tion was designed to target government contracts." *Yankee Atomic,* 112 F.3d at 1575. Factors relevant to the analysis include (1) whether the legislation falls exclusively or substantially on those with government contracts, *see Winstar,* 518 U.S. at 893, 116 S.Ct. 2432; *Yankee Atomic,* 112 F.3d at 1575; (2) whether the legislation was "directed to abrogating ... contracts for reasons of economy," *Yankee Atomic,* 112 F.3d at 1577; (3) whether the legislation "has the substantial effect of releasing the Government from its own contractual obligations," as opposed to only having an incidental impact on public contracts, *Winstar,* 518 U.S. at 899, 920–21, 116 S.Ct. 2432; and (4) whether "the legislation was passed for the benefit of the Government-as-contractor," thereby violating the rule that "the Government as contractor cannot [without becoming liable for breach damages] exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing, or violating the particular contracts into which it had entered with private parties." *Yankee Atomic,* 112 F.3d at 1575. *See also Winstar,* 518 U.S. at 891, 116 S.Ct. 2432; *Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (discussing restrictions on the Government's ability to abrogate contracts for its own economic benefit).

The Category 3 documents listed in Exhibit N as relating to the sovereign act issue, along with the Category 4 documents relating to the Government's revenue estimates, are potentially relevant to deciding if the Guarini legislation was targeted, because they may provide significant information regarding the scope and effect of the Guarini legislation. The court therefore denies the Government's relevance objections in connection with these documents.

There are, however, limitations on the scope of discovery that may be permitted in connection with this issue. Inquiry into whether a particular act qualifies as an exercise of sovereign power should presumptively be limited to focusing on the words of the statute itself or on its legislative history.[5]

---

5. Indeed, in this case, public documents quoted in the amicus brief filed by the *C–L–C* plaintiffs

give some indication that the Guarini legislation was targeted at thrift acquirers who received

*See Winstar,* 518 U.S. at 900–02, & n. 48–49, 116 S.Ct. 2432 (focusing solely on the language and legislative history in determining whether FIRREA was targeted at contractors); *Yankee Atomic,* 112 F.3d at 1575–77 (focusing solely on the language of the Energy Policy Act of 1992 in determining whether it was targeted at particular government contractors).

The court will not permit discovery encompassing depositions of members of Congress or Congressional staffers, extensive inquiry into informal agency communications with Congress, or extrapolations of Congressional intent from documents that have no direct connection to material contained in the legislative history. *See Longshore v. United States,* 77 F.3d 440, 443 (Fed.Cir.), *cert. denied,* 519 U.S. 808, 117 S.Ct. 52, 136 L.Ed.2d 15 (1996) (suggesting that "inquiry into ... the work of Congressional committees and staff, and into the minds of Congress itself, would be nothing but an invitation to mischief."). The documents sought in First Heights' narrowed list are consistent with this limitation. The legislative history of the Guarini bill contains a revenue estimate for how much money the bill was expected to raise, but does not explain the basis for this estimate. First Heights has argued that this estimate may have been arrived at simply by adding up the cumulative value of the covered asset loss deductions that the acquiring thrifts were expected to utilize, and then inserting this total into the Guarini bill as an estimate of how much revenue could be raised if covered asset loss deductions were taken away. First Heights contends that the documents it seeks are likely to show how the revenue estimate was generated, thus potentially providing evidence that the Guarini legislation was targeted at thrift acquirers who received FSLIC assistance. First Heights has thus established a sufficient connection between the documents it seeks and the legislative history of the Guarini bill.

*Defendant's motion to stay discovery*

Also pending is the Government's September 3, 1999 motion to stay discovery in the cases involving plaintiffs Coast–to–Coast, Local America, Centex, and First Nationwide. Coast–to–Coast, Local America and Centex (the "*C–L–C* plaintiffs") responded jointly in opposition to the Government's motion. First Nationwide file a separate response.

The Government argues that many of the legal issues raised in its motion for summary judgment on First Heights' tax benefit claims are common to all of these cases, and that further discovery involving the *C–L–C* plaintiffs and First Nationwide should be suspended until the court resolves the pending motion for summary judgment in First Heights. The *C–L–C* plaintiffs counter that several issues raised by the Government, including both the alleged absence of a promise regarding covered asset losses and the effect of the integration clause, may be resolved differently in each case because of unique circumstances surrounding formation of the individual contracts. First Nationwide also argues that the issues raised in its case are unique, and that limited additional discovery will allow it to soon file its own motion for summary judgment, thereby promoting the speedy and efficient resolution of its claims.

### 1. *C–L–C* Discovery Issues

After considering the parties' arguments, the court is of the opinion that defendant's motion for a stay of discovery in connection with the claims of the *C–L–C* plaintiffs should be denied. The cases before the court have not been consolidated, and so the potential existence of similarities between the claims of the *C–L–C* plaintiffs and First Heights is not an adequate justification for preventing the *C–L–C* plaintiffs from moving forward while the Government litigates its summary judgment motion against First Heights. The *C–L–C* plaintiffs, certainly, would not be bound by the results in First Heights. The Government, of course, is free to file separate motions for summary judgment against the *C–L–C* plaintiffs at any time, and can, if

---

FSLIC assistance. *See* C–L–C *Amicus brief* at 39 (quoting H.R.Rep. No. 111, 103d Cong. 1st Sess. 669 (May 25, 1993), which states that "Allowing tax deductions for losses on covered assets that are compensated for by FSLIC assistance gives thrift institutions a perverse incentive to minimize the value of these assets when sold.").

it wishes, present the same defenses it has offered against First Heights.

The parties have requested that the court resolve a number of specific outstanding disputes in connection with the Government's motion to stay and the plaintiffs' motion to extend discovery. Initially, the court notes that the Government has already provided approximately 200,000 pages of responsive documents to all of the plaintiffs. In addition, plaintiffs have access to all of the material made available through *Winstar* common discovery. It is with respect to approximately 1,300 additional responsive documents that the Government seeks to assert a variety of privileges.

Along with the documents already produced, the *C–L–C* plaintiffs urge that the Government be required to conduct additional searches for responsive documents in the Government's REMATS database, using a list of 80 search terms proposed by the plaintiffs. Plaintiffs rely on the court's July 8, 1999 order, in which the court stated that plaintiffs would be permitted to propose (and subsequently modify) a list of search terms for additional REMATS searches. Following the court's order, the *C–L–C* plaintiffs provided the Government with 40 search terms derived from the Records Disposition Schedules ("RDS") of the Federal Deposit Insurance Corporation and the Resolution Trust Corporation. The Government completed its searches using these terms, and subsequently provided the *C–L–C* plaintiffs with 41 boxes of responsive documents. The *C–L–C* plaintiffs reviewed the boxes, and the Government then provided copies of the documents that the *C–L–C* plaintiffs requested. The Government contends that this effort was sufficient, and argues that the list of additional searches proposed by the *C–L–C* plaintiffs contains search terms that are overly broad and thus unreasonable. The *C–L–C* plaintiffs respond that they were forced to provide broad search terms because the Government did not provide the results from the RDS searches until after the September 30, 1999 discovery cutoff that had been set by the court.

The court believes that the dispute regarding further REMATS searches can be satis-factorily resolved if the parties meet and negotiate a limited universe of more particularized search terms. The documents obtained as a result of the RDS searches were provided to the plaintiffs in October 1999, and the court believes that, consistent with the earlier representations of the *C–L–C* plaintiffs, review of these documents will have provided information that can be used to refine the list of additional REMATS search terms. The court also notes that the *C–L–C* plaintiffs' current list contains several overly broad terms, such as "Representative," "House," and "Bill." Searches using such terms are likely to generate thousands of useless responses and would require a significant expenditure of resources. The court, therefore, is likely to take an unfavorable view of efforts to force REMATS searches using terms that are not focused. In view of the court's extension, *infra*, of the period for discovery, the court will assume the parties can reach an agreement on the proper scope of a further REMATS search.

Also pending is the *C–L–C* plaintiffs' October 15, 1999 motion for leave to serve requests for admission on the Government. Although many of these requests appear to implicate matters that the Government will be unable to admit or deny, some of them do seem to offer a promising approach to short-circuiting some of the discovery disputes presented in the parties' briefing on the plaintiffs' May 22, 1999 joint motion to compel. The motion is thus granted, and the Government is directed to respond within 30 days of the date that the requests are served.

As to the *C–L–C* plaintiffs' objections to the Government's assertion of privilege as to previously identified documents, the arguments of the parties have been set out in their briefing on the plaintiffs' May 22, 1999 joint motion to compel, as well as in the briefing on First Heights September 24, 1999 motion to compel. The court will deal with privilege claims in the context of First Heights' narrowed document request. If, after a ruling on the privilege claims in that context, the parties cannot reach agreement, the court will separately address the remaining documents as to which privilege is assert-

ed. In the interim, production of these documents is not required.

### 2. *First Nationwide* Discovery Issues

First Nationwide, in its opposition to the Government's motion to stay, argues that its claim differs substantially from those of the other plaintiffs. It states that it is not alleging a promise to allow deduction of covered asset losses, but rather a promise that if covered asset loss deductions became unavailable, the Government would refrain from making scheduled reductions in the direct assistance provided to First Nationwide. Although some of the issues arising in connection with this claim may be similar to those presented in the other cases, it also appears that some of the Government's proposed defenses, particularly its statutory defenses asserting lack of authority (26 U.S.C. § 7801) and the necessity of a signed closing agreement (26 U.S.C. § 7121) may not be directly applicable to First Nationwide's theory. Discovery in the cases involving the *C–L–C* plaintiffs, therefore, may be different from what is necessary to resolve First Nationwide's claim. By the same token, resolution of the Government's motion for summary judgment as to *First Heights* would appear to be less relevant to the legal issues arising in *First Nationwide*. For this reason, the court is prepared to accept for the time being First Nationwide's statement that discovery in its case is "nearly complete," and that it may soon be able to file a dispositive motion against the Government on the issue of liability once it receives responses to its outstanding discovery requests. Accordingly, the Government's motion for a stay of discovery in *First Nationwide* is denied. The Government is ordered to respond to First Nationwide's outstanding interrogatories within 30 days of the date of this order.

*Plaintiffs' joint motion to extend discovery*

Finally, plaintiffs moved jointly on September 29, 1999 to extend discovery beyond the September 30, 1999 deadline contained in the court's July 8, 1999 order. The motion is granted. Discovery shall be completed on or before May 26, 2000.

### CONCLUSION

The following is ORDERED:

1. Defendant's September 3, 1999 motion to stay discovery in *Coast–to–Coast, Local America, Centex* and *First Nationwide* is denied.

2. Plaintiffs Coast–to–Coast, Local America and Centex' October 15, 1999 motion for leave to serve requests for admission is granted. Defendant is directed to respond to the requests for admission within 30 days from the date the requests are served.

3. Defendant is directed to respond to plaintiff First Nationwide's outstanding interrogatories within 30 days of the date of this order.

4. Defendant's relevance objections to First Heights' September 24, 1999 motion to compel production of the Categories 1–4 documents are denied. On or before February 1, 2000, defendant shall produce for *in camera* review by the court the Category 1 and 2 documents, which are identified in Attachments 1 and 2 to Exhibit A of defendant's September 3, 1999 motion to stay discovery in certain tax benefit cases.

5. The plaintiffs' September 29, 1999 joint motion to extend discovery is granted. Discovery shall be completed on or before May 26, 2000.

6. Insofar as they relate to defendant's assertion of privilege, the following motions remain pending: Coast–to–Coast, Local America, Centex and First Heights' May 22, 1999 joint motion to compel; First Nationwide's May 24, 1999 motion to compel; and First Heights' September 24, 1999 motion to compel.

7. First Heights' obligation to respond to defendant's March 16, 1999 motion for summary judgment is deferred pending further order of the court.