**CARABETTA ENTERPRISES, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 02–1134C.

United States Court of Federal Claims.

Nov. 25, 2003.

Steven J. Rosenbaum and Robert K. Kelner, Covington & Burling, Washington, D.C., for plaintiffs.

John E. Kosloske and Wanda Rubianes, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Arnette L. Georges, Office of General Counsel, United States Department of Justice, Washington, D.C., of counsel.

## OPINION AND ORDER

HODGES, Judge.

The parties filed cross-motions for summary judgment on liability in this breach of contract case. Plaintiffs are owners and managers of low-income housing properties in Massachusetts and Connecticut.[1] They allege that the Government did not provide guaranteed loans for their properties as promised. We grant plaintiffs' motion for partial summary judgment.

## BACKGROUND

### A.

Plaintiffs acquired low-income properties during the 1960's and 1970's with mortgage loans issued pursuant to section 221(d)(3) or Section 236 of the National Housing Act. Pub.L. No. 90–448, 82 Stat. 577 (1968), as amended. The Department of Housing and Urban Development insured the loans. The original deeds to plaintiffs' properties provided that the owners could pay the balance of related mortgage loans after twenty years.

Congress became concerned that owners would prepay their mortgages and convert the housing to more profitable rental units. This could cause a shortage of low-income housing. The Emergency Low Income Housing Preservation Act of 1987 (ELIHPA) addressed this concern. Pub.L. No. 100–242, 101 Stat. 1877 (pertinent parts reprinted at 12 U.S.C. § 1715*l* note). ELIHPA prohibited prepayment of the mortgages without HUD approval. Later, Congress passed the Low–Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA). Pub.L. No. 101–625, 104 Stat. 4249 (codified at 12 U.S.C. § 4101–4147). These statutes prohibited owners from prepaying mortgages without HUD approval and provided incentives to low-income housing developers. *See* 12 U.S.C. §§ 4101. They also introduced "affordability restrictions." Congress designed the restrictions to maintain rental rates at affordable levels for minorities and low-income tenants. Restrictions included limiting the equity that owners could realize from their properties. Developers who agreed to such restrictions qualified for mortgage insurance and government loan guarantees.

Plaintiffs were among the low-income property owners qualifying for mortgage insurance and government loan guarantees. This allowed them to realize some equity in their projects while operating them as low-income properties. *See* 101 Stat. 1884. Congress added additional restrictions to the program by its passage of LIHPRHA in 1990. 12 U.S.C. § 4108. The 1990 law required property owners to provide "plans of action" to HUD, describing how they would operate and maintain their properties as low-income housing. The law provided new incentives for owners whose plans of action were approved. Incentives included second mortgage loan insurance and access to equity in the owners' housing projects. *See* 12 U.S.C. §§ 4109(b)(5) and (b)(7).

LIHPRHA prohibited such incentives to owners who had unresolved findings of noncompliance with HUD regulations. 24 C.F.R. § 248.145(a)(12)(1994). HUD auditors discovered violations related to plaintiffs' distribution of rent proceeds in their 1992 financial statements. The auditors alleged that Carabetta diverted project funds, failed to remit excess income, and neglected to refund rent overpayments to tenants. HUD refused to process plaintiffs' plans of action for LIHPRHA incentives.

### B.

Plaintiffs settled the adverse audit findings by signing a Repayment Agreement with the Government in August 1994. The Repayment Agreement provided that the Government would insure low-interest second mortgage loans for eight of Carabetta's properties listed on Schedule C of the Agreement. Plaintiffs promised to use $11 million of the equity loan proceeds to repay the rent overpayments and the project funds that they allegedly diverted. The parties agreed to use properties from Schedule D to cover plain-

---

1. Plaintiffs are Carabetta Enterprises, Inc. and its affiliated companies, and the limited partnerships in which Carabetta Enterprises or Joseph F. Carabetta serves as general partner. This Opinion will refer to these entities as Carabetta or plaintiffs.

tiffs' obligations if the Schedule C properties did not produce enough equity to repay HUD. Plaintiffs fulfilled their obligations with respect to Schedule C the following year, in May 1995.[2] They did not need the properties listed on Schedule D to supplement Schedule C.

Defendant also agreed to process equity loan applications and to insure mortgages for the twenty-six properties listed on Schedule D of the Repayment Agreement.[3] Plaintiffs warranted that they would comply with all underwriting requirements and other HUD regulations. These requirements included maintaining the rental properties, submitting timely project reports, and making plaintiffs' financial books available for inspection.

### C.

Congress appropriated funds for operation of HUD and other agencies in September 1996. *See* Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997, Pub.L. No. 104–204, 110 Stat. 2874 (1996). The appropriation included approximately $6 billion for HUD to use for preserving the low-income housing program in fiscal year 1997. It set aside $350 million for LIHPRHA or ELIHPA housing projects. *See* 110 Stat. 2884. Congress also repealed HUD's authority to make the section 241(f) equity loans that were the subject of HUD's Repayment Agreement with plaintiffs. The

1997 Act replaced insured equity loans with capital loans paid directly to low-income property owners.[4]

The new law earmarked or "carved out" $75 million from the $350 million set-aside for HUD to spend in its discretion among three categories of housing projects. *See* 110 Stat. 2884. The deadline for obligating direct capital loans was March 1, 1997. *Id.* The categories for which the new law earmarked funds generally were projects that had been delayed for one reason or another.[5] One such category was Repayment Agreements executed before September 1995. This category included the Carabetta owners' agreement with the Government to resolve their unfavorable audit findings.

HUD used $25 million of the earmarked funds in January and February 1997 to provide capital loans to seven of plaintiffs' twenty-six properties listed on Schedule D of the Repayment Agreement. *See* Preservation Letters 97–2, 97–3 and 97–3–A (1997).[6] HUD apparently distributed the remaining $50 million to categories that were unrelated to the parties' Repayment Agreement.

### DISCUSSION

The Repayment Agreement obligated defendant to insure the twenty-six properties listed on plaintiffs' Schedule D. Defendant used $25 million of the $75 million earmarked for projects such as plaintiffs' to insure seven of the Carabetta owners' properties. Plain-

---

**2.** The Agency issued a memorandum in December 1995 confirming that "Joseph Carabetta and Carabetta Enterprises, Inc. fulfilled the requirements of the Repayment Agreement and all audit findings have been closed." HUD Memorandum dated December 6, 1995.

**3.** "Once the payments required by this Agreement have been made, [HUD] will process the Sec. 241(f) applications for the [twenty-six] projects identified in *Schedule D* ... and will insure the mortgages for those projects ...." Repayment Agreement, Provision 4.

**4.** The capital loans were limited to sixty-five percent of the equity on property owners' projects. Equity loans under ELIHPA allowed owners to borrow up to ninety percent of equity; the limit under LIHPRHA was seventy percent.

**5.** The 1997 Appropriations Act states in relevant part:

> $350,000,000 shall be available for use in conjunction with properties that are eligible for assistance under the [LIHPRHA or ELIHPA], of which 75,000,000 shall be available for ... projects (1) that are subject to a repayment or settlement agreement that was executed between the owner and the Secretary prior to September 1, 1995; (2) whose submissions were delayed as a result of [being] designated as a Federal disaster area in a Presidential Disaster Declaration; or (3) whose processing was, in fact or in practical effect, suspended, deferred, or interrupted for a period of twelve months or more because of differing interpretations ....
>
> 110 Stat. 2884.

**6.** HUD used Preservation Letters to notify owners of the properties that would be covered by the direct loans and to disclose the amounts.

tiffs argue that this was a breach of contract. Defendant's response is that the 1997 Appropriations Act included a provision that HUD had agreed to make for the Schedule D properties. Defendant cites the Restatement on impracticability as follows:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981). Defendant acknowledges that the Government's own actions caused the alleged impracticability, but argues that the sovereign acts doctrine operates to shield the Government from breach liability in such a circumstance.

### A. Contract Modification

The 1997 Appropriations Act revoked HUD's authority to make the type of equity loan contemplated by the Repayment Agreement. It substituted another loan thought to be less confusing and expensive, the direct capital loan. Defendant issued the new direct loan guarantees to plaintiffs, and plaintiffs accepted these loans complying with the contract's original terms.

■ "[M]odification of a contract is a change ... which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed." *International Bus. Lists, Inc. v. AT & T*, 147 F.3d 636, 641 (7th Cir.1998). "A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance." *Id.* (citations omitted). Addition of a contract term that is inconsistent with an existing term agreed to by the same parties is presumed to have rescinded the earlier, inconsistent term. *See Bechtel Corp. v. Laborers' Int'l Union*, 544 F.2d 1207, 1213 (3d Cir.1976) (citing RESTATEMENT OF CONTRACTS § 408 (1932)).

■ The parties have argued whether Congress has the authority to amend or modify a contract. Plaintiffs cite a Ninth Circuit case involving the allegation that Congress was functioning as an executive agency. *Apache Survival Coalition v. United States*, 21 F.3d 895 (9th Cir.1994). The court analyzed *Apache* as a separation of powers issue. It held that Congress could modify an executive agency's duties as defined by a statute. *Apache*, 21 F.3d at 905.

*Apache* is not a contract case. The *Carabetta* case does not depend on whether Congress has the authority to modify contracts. Congress directed HUD to eliminate its insured equity loan program and to make direct loans to the owners instead. The same legislation that Congress used to repeal HUD's authority to make equity loans authorized HUD to make direct capital loans. The intent and purpose of both types of loans was the same—to give owners incentives to maintain and operate their properties as low-income housing.

Congress did not modify the parties' contract. The parties adopted the new type of loan that Congress authorized HUD to make. HUD made capital loans to plaintiffs under the Repayment Agreement, using $25 million of the funds appropriated by the new law. Plaintiffs accepted the capital loans in place of equity loans, and the contract's "general purpose and effect" was undisturbed. *International Bus. Lists*, 147 F.3d at 641. Neither party objected to the new procedure.

Congress gave HUD discretion to allocate $75 million among three categories of programs. The Agency made $25 million available to plaintiffs for seven of their properties on Schedule D. HUD's offer of capital loans to comply with its contract, and Carabetta's acceptance of those loans, effected a modification of the contract to that extent. The parties embarked upon a course of conduct that was consistent with acceptance of the modified procedure. *See, e.g., E.H. Ladum v. United States*, 5 Cl.Ct. 219, 223 (1984) (stating that modification of existing obligations may be inferred from the conduct of the parties after formation of the contract).

## B. Sovereign Acts Doctrine

The contract obligated HUD to provide loans to twenty additional properties listed on Schedule D of the Repayment Agreement. Defendant contends that the 1997 Appropriations Act rendered its performance of the contract impossible and that the sovereign acts doctrine excuses the Government from liability. *See General Dynamics Corp. v. United States,* 47 Fed.Cl. 514, 533 (2000).

 "[T]he United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign." *Jones v. United States,* 1 Ct.Cl. 383, 385, 1865 WL 1976 (1865). The sovereign acts doctrine shields the Government from liability for breach of contract if the breach resulted from its public and general acts as a sovereign. *See Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925). So long as a sovereign act is public and general, it will not "alter, modify, obstruct or violate the particular contracts into which it enters with private persons." *Jones,* 1 Ct.Cl. at 384, 1865 WL 1976.

> The sovereign acts doctrine thus balances the Government's need for freedom to legislate with its obligation to honor its contracts .... If the Government is to be treated like other contractors, some line has to be drawn ... between regulatory legislation that is relatively free of Government self-interest and ... on the other hand, statutes tainted by a governmental object of self-relief.

*United States v. Winstar Corp.,* 518 U.S. 839, 896, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The nature of the Government's conduct determines whether its action is "public and general." *See Orlando Helicopter Airways, Inc. v. Widnall,* 51 F.3d 258, 262 (Fed.Cir. 1995). The court uses a case-specific inquiry to examine the scope of the legislation to see "whether, on balance, that legislation was designed to target prior governmental contracts." *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1575 (Fed.Cir.1997). "[An] inquiry into possible 'targeting' by Congress is relevant to determining whether the alleged breach is merely an incidental effect of a sovereign act designed to promote the public good, or instead is a deliberate attempt by Congress to alter its previous bargain with the contractor." *Coast-to-Coast Fin. Corp. v. United States,* 45 Fed.Cl. 796, 804 (2000).[7] For example, the Supreme Court noted that Congress had the "specific object of abrogating enough of the [thrift merger] contracts as to make that consequence of [FIRREA] a focal point of the congressional debate." *Winstar,* 518 U.S. at 900, 116 S.Ct. 2432.

 Congress did not repeal section 241(f) equity loans to abrogate HUD's contractual obligations with Carabetta. The Act redesigned the low-income housing program, in part by making a new type of loan available to owners. Its purpose was not to modify the Carabetta Repayment Agreement or to void any of its provisions. The contract modification arose from the parties' own actions after Congress implemented the 1997 Act. HUD obligated $25 million to Carabetta's Schedule D properties in consequence of the Repayment Agreement. Carabetta accepted the direct loans. Congress had no role in these bilateral actions of the parties to the Repayment Agreement.

 The second prong of the analysis related to the sovereign acts doctrine is whether the Government can show that the elimination of section 241(f) equity loans by Congress was "an event the non-occurrence of which was a basic assumption on which the contract was made...." *See* RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981). In other words, did the parties anticipate such an act of the sovereign when they entered the contract. *E.g., Scott Timber Co. v. United States,* 40 Fed.Cl. 492, 508 (1998), *rev'd on other grounds,* 333 F.3d 1358 (Fed. Cir.2003) (parties foresaw the possibility

---

7. Additional factors may aid a court in determining whether the sovereign acts doctrine applies to legislative activity. These include whether the legislation (1) falls exclusively or substantially on those with government contracts; (2) was enacted to abrogate government contracts with private parties for economic reasons; (3) has an incidental or substantial effect of releasing the Government from its contractual obligations; or (4) was passed for the benefit of the government in its capacity as contractor. *Coast-to-Coast Fin.,* 45 Fed.Cl. at 804.

that a sovereign act could affect the contract and they "set[ ] forth the rights and responsibilities of the parties" should it arise). The parties to the Repayment Agreement did not foresee the possibility that Congress would change the type of loan that HUD could use to meet the contract requirements. If they had, the court would enforce any alternative provisions that the parties made to address the change. The contract would control even if the breach otherwise were a sovereign act.

## CONCLUSION

The 1997 Appropriations Act did not breach the parties' contract. The parties adopted the direct loan program that Congress authorized in place of the equity loans that it eliminated. Defendant made $25 million in loans under the new regime, and plaintiffs accepted the loans as complying with the contract. Congress gave HUD discretion to allocate funds among various categories of programs, but this did not authorize HUD to breach a contract to which it was already a party.

Congress did not target plaintiffs' contract by the provisions of the 1997 Appropriations Act. The Act's purpose was public and general. It was an effort to preserve the low-income housing program and to reduce its costs, partly by eliminating section 241(f) equity loans. The law was a sovereign act that the parties neither anticipated nor provided for in their contract. The parties to the Repayment Agreement did not include provisions to address the possibility that a sovereign act would substitute one type of authorized loan for another three years after they signed the contract.

Plaintiffs' motion for partial summary judgment is GRANTED. Defendant's motion for summary judgment is DENIED. The parties will notify the court within ten days whether we should schedule additional hearings to resolve the remainder of this case.