**CARABETTA ENTERPRISES, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 02–1134C.**

United States Court of Federal Claims.

Oct. 19, 2005.

Steven J. Rosenbaum and Robert K. Kelner, Covington & Burling, Washington, D.C., for plaintiffs.

Richard S. Ewing, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Carole W. Wilson, Angelo Aiosa, and Batina R. Wills, Department of Housing and Urban Development, Washington, D.C., of counsel.

## OPINION AND ORDER

HODGES, Judge.

Plaintiffs are Carabetta Enterprises and the limited partnerships in which Carabetta Enterprises or Joseph F. Carabetta serves as general partner. They are owners and managers of low-income housing properties in Massachusetts and Connecticut. When the Department of Housing and Urban Development declined to provide Carabetta loans for their properties as promised, they sued the Government for breach of contract. We granted plaintiffs' motion for partial summary judgment on the breach claim and conducted a trial on damages.

## BACKGROUND

The Government began developing low-income housing programs in the 1930's by creating the Federal Housing Administration. *See* National Housing Act, Pub.L. No. 73–479, § 1, 48 Stat. 1246 (1934). Later programs authorized government-insured mortgages for property that would be used for low-income housing. *See* § 207, 48 Stat. at 1252. One such program was known as Section 221(d)(3) housing. Initially it was limited to non-profit and public housing corporations, but later expanded to include private investors. Housing Act of 1961, Pub.L. No. 87–70, § 101, 75 Stat. 149, 150–51 (codified as amended at 12 U.S.C. § 1715*l*).

Congress added authority for the Section 236 program in 1968. Housing and Urban Development Act of 1968, Pub.L. No. 90–448,

§ 236, 82 Stat. 476, 498–501. Section 236 extended mortgage insurance and interest-rate subsidies to private owners of low-cost housing. *Id.* Plaintiffs acquired their low-income properties during the 1960's and 1970's with mortgage loans issued pursuant to Section 221(d)(3) and Section 236 of the National Housing Act. The Department of Housing and Urban Development insured these loans.

Plaintiffs' deeds to the properties provided that the owners could pay the balance of their mortgage loans after twenty years. As the twenty-year period approached, Congress became concerned that a shortage of low-income housing would result from owners prepaying their mortgages and converting the housing to more profitable rental units. Congress passed legislation to address this concern.

### ELIHPA and LIHPRHA

Congress enacted the Emergency Low–Income Housing Preservation Act of 1987 (ELIHPA) to avoid widespread prepayment of the mortgages, resulting in a shortage of low-income housing. Pub.L. No. 100–242, 101 Stat. 1877 (1988) (pertinent parts reprinted at 12 U.S.C. § 1715*l* note). ELIHPA required owners to obtain HUD approval before prepaying their mortgages as permitted by their deeds. The Act made it difficult for owners to prepay but "sweetened the pot" by allowing the owners to realize some of their equity in the housing projects while still operating the housing at affordable levels. HUD accomplished this in part by insuring second mortgages on the properties. Payments on the second mortgages went to private lenders, so HUD permitted owners to increase rents to cover the cost of debt service. It also provided rental subsidies to tenants under Section 8 of the Federal Housing Assistance Program.

Congress added additional restrictions to the program by its passage of the Low–Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA). Pub.L. No. 101–625, § 601(a), 104 Stat. 4249 (codified at 12 U.S.C. §§ 4101–4147). LIHPRHA elaborated on the ELIHPA scheme, but with slightly different procedures for obtaining loans. LIHPRHA put the burden on

owners to devise their own plans for operating affordable housing by submitting Plans of Action to HUD. 12 U.S.C. §§ 4107–09. The Plans of Action would propose incentives, such as second mortgage loan insurance and access to equity in the owners' housing projects, in exchange for their continued operation of low-income units. 12 U.S.C. §§ 4109(b)(5), (b)(7). Equity loans were a common incentive requested by the owners. "Equity loans" were provided by HUD to owners of affordable housing "who agree to extend the low-income affordability restrictions on the housing pursuant to an approved plan of action." 12 U.S.C. § 1715z–6(f). "Affordability restrictions" were designed to insure that owners would maintain rents at affordable levels for low-income tenants. 12 U.S.C. § 4119(3).

Congress appropriated approximately $6 billion for HUD's use in preserving the low-income housing program in fiscal year 1997. Department of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1997, Pub.L. No. 104–204, 110 Stat. 2874 (1996). The appropriation included a $350 million set-aside for LIHPRHA and ELIHPA housing projects. 110 Stat. at 2884.

### Repayment Agreement

HUD audited Carabetta between 1990 when LIHPRHA was enacted and 1996 when Congress passed the appropriations legislation. The audit alleged certain unauthorized practices by plaintiffs.[1] LIHPRHA prohibited incentives to owners with unresolved findings of noncompliance with HUD regulations. 24 C.F.R. § 248.145(a)(12) (1994). HUD refused to process plaintiffs' Plans of Action for LIHPRHA incentives because of the allegations.

Plaintiffs settled the adverse audit findings by signing a Repayment Agreement with the Government in August 1994. The Repayment Agreement provided that Carabetta would use $11 million of their equity loan proceeds to reimburse the rent overpayments and the project funds that they allegedly had diverted. Plaintiffs also warranted that they would comply with all underwriting requirements and other HUD regulations. These requirements included maintaining the rental properties, submitting timely project reports, and making plaintiffs' financial books available for inspection.

The Government agreed in return to insure low-interest second mortgage loans for eight of Carabetta's properties listed in the Repayment Agreement as Schedule C. Defendant also promised to process equity loan applications and to insure mortgages for twenty-five of plaintiffs' properties listed on Schedule D. The Repayment Agreement provided, "[o]nce the payments required by this Agreement have been made, [HUD] will process the Sec. 241(f) applications for the [twenty-five] projects identified in *Schedule D* ... and will insure the mortgages for those projects ...."[2] Repayment Agreement, Provision 4.

The Appropriations Act repealed HUD's authority to make the Section 241(f) equity loans that were the subject of HUD's Repayment Agreement with plaintiffs. *See* 110 Stat. at 2885 (repealing Section 241(f) of the National Housing Act). Congress replaced the Section 241(f) program with long-term, zero-interest direct capital loans to the owners. *Id.* This program was a simplification of the equity loan scheme and allowed HUD to make single, direct payments to the owners. The capital loans were limited to sixty-five percent of the equity on the property owners' projects. Equity loans under ELIHPA had allowed owners to borrow up to ninety percent of their equity; the limit under LIHPRHA was seventy percent.

Congress also earmarked or "carved out" $75 million of the $350 million set-aside for

---

1. HUD auditors had discovered violations related to plaintiffs' distribution of rent proceeds in their 1992 financial statements. The auditors alleged that Carabetta had diverted project funds and had neglected to refund rent overpayments to tenants.

2. Plaintiffs contended that Schedule D included twenty-six properties, but one of these was Southford Park. The Repayment Agreement did not list Southford Park on Schedule D, but mentioned it in a footnote citing plaintiffs' claim of eligibility for Southford Park. That property is described in more detail later in this Opinion.

three categories of housing projects.[3] These projects included the Repayment Agreement between Carabetta and HUD. HUD used Preservation Letters to notify owners of the properties that would be covered by the new direct loans. The Letters showed that $25 million of the earmarked funds would provide capital loans to only seven of plaintiffs' twenty-five properties listed on Schedule D of the Repayment Agreement. *See* Preservation Letters 97–2, 97–3, and 97–3A (1997). HUD apparently distributed the remaining $50 million to categories of housing projects that were unrelated to the parties' Repayment Agreement.

Plaintiffs contended that HUD's use of the available funds was a breach of their Repayment Agreement. We agreed. *See Carabetta Enters., Inc. v. United States,* 58 Fed.Cl. 563, 567 (2003).

> Congress gave HUD discretion to allocate $75 million among three categories of programs. The Agency made $25 million available to plaintiffs for seven of their properties on Schedule D. HUD's offer of capital loans to comply with its contract, and Carabetta's acceptance of those loans, effected a modification of the contract to that extent.

The Repayment Agreement obligated defendant to insure twenty-five properties listed on plaintiffs' Schedule D. HUD used only $25 million of the $75 million earmarked for projects such as plaintiffs'. While Congress gave HUD discretion to allocate funds among various categories of programs, this did not authorize HUD to breach a contract to which it was already a party. *Id.* at 569. We scheduled a trial to determine damages after ruling on the parties' motions for summary judgment. *Id.*

## LEGAL STANDARDS

Once a court has ruled that a breach occurred, the non-breaching party may choose to pursue various damage theories including expectation, reliance, and restitution. *Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297, 1308 (Fed.Cir.2004). Plaintiffs asserted that expectation damages will put Carabetta in as good a position as they would have occupied if the Repayment Agreement had been fully performed. That is, had all of the Carabetta properties on Schedule D received the promised capital loans and other incentives.

■ Expectation damages give the non-breaching party "the benefits he expected to receive had the breach not occurred." *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001); *Hansen,* 367 F.3d at 1308; *see also Restatement (Second) of Contracts* § 344. "[E]xpectation damages are often equated with lost profits ... [but] they can include other damage elements as well." *Glendale Fed.,* 239 F.3d at 1380; *Cal. Fed. Bank v. United States,* 245 F.3d 1342, 1349 (Fed.Cir.2001). "[D]amages should reflect what would have been gained (or lost) had performance been allowed to proceed." *Castle v. United States,* 48 Fed.Cl. 187, 207 n. 16 (2000) (citing *Restatement (Second) of Contracts* § 352 cmt. b, § 344 cmt. b). The Government did not dispute plaintiffs' argument that expectation damages were the appropriate means of calculating damages in this case. Expectation damages are measured by the loss in value of defendant's performance to Carabetta. *Restatement (Second) of Contracts* § 347. Plaintiffs contended they are entitled to damages measured by the loss of returns on interest-free loans that HUD was obligated to provide under the Repayment Agreement.

■ Damages normally are determined as of the date of breach. *See, e.g., Reynolds v. United States,* 141 Ct.Cl. 211, 158 F.Supp. 719, 725 (1958). Courts may consider post-

---

**3.** The 1997 Appropriations Act states in relevant part:

> $350,000,000 shall be available for use in conjunction with properties that a eligible for assistance under [LIHPRHA or ELIHPA], of which 75,000,000 re shall be available for ... projects (1) that are subject to a repayment or settlement agreement that was executed between the owner and the Secretary prior to

September 1, 1995; (2) whose submissions were delayed as a result of [being] designated as a Federal disaster area in a Presidential Disaster Declaration; or (3) whose processing was, in fact or in practical effect, suspended, deferred, or interrupted for a period of twelve months or more because of differing interpretations ....

110 Stat. at 2884.

breach evidence to value the contract expectancy more accurately, however. *Castle*, 48 Fed.Cl. at 207 n. 16. Plaintiffs must establish foreseeability, causation, and reasonable ascertainment of loss to recover for expectation damages. *Cal. Fed.*, 245 F.3d at 1349; *Bluebonnet Savings Bank v. United States*, 266 F.3d 1348, 1355 (Fed.Cir.2001).

Plaintiffs must prove that the Government foresaw or reasonably could have foreseen the consequences at the time of its breach. *E.g., Chain Belt Co. v. United States*, 127 Ct.Cl. 38, 115 F.Supp. 701, 714 (1953). The Government did not argue that Carabetta's damages were not foreseeable. Moreover, the breach of plaintiffs' Repayment Agreement was a substantial factor in causing the injury. A government expert explained,

> [c]ash has value. It can be invested. It can be used to generate a return.... [B]ecause the Plaintiffs did not receive the capital loans, they were not able to cash out a portion of their equity in their property and put that cash to work earning a return in some other manner.

Tr. at 477. HUD did not provide the loans to Carabetta as promised. Without control over the proceeds, Carabetta could not earn a return on them.

Damages must be established with reasonable certainty. *Cal. Fed. Bank*, 245 F.3d at 1349. The court may "make a fair and reasonable approximation of the damages." *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960). Carabetta would have obtained financial benefits from the loan proceeds had they been available. A reasonable return on loan proceeds in the but-for world is the proper measurement of plaintiffs' claim to expectation damages. The parties agreed on a means of assessing the financial impact of the court's findings on each of the issues presented and provided software to assist in calculating damages.[4]

## DISCUSSION

The parties identified a number of issues for the court to consider in calculating damages. Most involve events that might have occurred in a but-for world. The breach in this case results from HUD's not having extended loans to plaintiffs as promised. Plaintiffs' damages are measured by the returns on investments or other income that Carabetta would have realized had the Government issued the loans to plaintiffs on time, according to the contract requirements. Some of the issues considered at trial are summarized below.

The return on loans due to Carabetta under the Repayment Agreement were a function of the appraised value of each property. The amount of the loans depended in part on whether they fell under Title II (ELIHPA) or Title VI (LIHPRHA) because those programs had different methods of appraising property.

Southford Park was a special case in that it alone had been funded by an earlier Housing Act program known as Section 221(d)(3). The parties disputed its qualification for listing on Schedule D as a candidate for direct capital loans. If Southford Park did qualify, the question remained whether it would have received loans under Title II or Title VI.

HUD had discretion to extend Carabetta's loan repayment dates after plaintiffs had paid out the mortgages securing them. An issue at trial was whether HUD would have demanded payment or exercised its discretion to extend the loans.

Plaintiffs were permitted to extract some of their equity, called dividends, in the properties in certain circumstances. We considered at trial whether the properties would have generated sufficient income to support the maximum dividends that plaintiffs could have withdrawn under their contract.

Plaintiffs claimed that money set aside in escrow for repairs would have had a value that should be added to the damages award. The issue was the value of such a set-aside, if any, and whether to include it as an element of damages.

The Government argued that plaintiffs would have sold the properties early had

---

4. The court calculated damages by using the parties' stipulated method. We appreciate coun-

sel's cooperation in this regard.

they received the loans. Early sales of the properties would reduce the damages award. Plaintiffs contended that it would not have been in their economic interest to sell.

Plaintiffs claimed that the damages award should be adjusted by a tax gross-up to account for the effect of Carabetta's having obtained a judgment for damages instead of the interest-free loans that it would have received absent the breach. Defendant disputed this notion, claiming that any award of damages would represent investment income from the loans. Such income would have been taxable, as a judgment would be.

The categories of disputed damages are (1) Title VI Properties, (2) Title II Properties, (3) Disbursement Schedule, (4) Loan Repayment Dates, (5) Increased Limited Dividends, (6) Repair and Replacement Components, (7) Credit for Sale of Unfunded Properties, (8) Early Sale of Properties, (9) Tax Gross–Up, and (10) Southford Park.

### A. Title VI Properties (LIHPRHA)

The preservation values of three Title VI properties were in dispute—Village Park I, Village Park II, and Southford Park.[5] Plaintiffs' claims arose from HUD's breach of its obligation to provide financial incentives required by the Repayment Agreement. The financial incentives for the properties varied according to their preservation value. LIHPRHA defined the term "preservation value" and established a process for calculating it. A property's preservation value essentially was its fair market value with standard modifications or adjustments.

The key issue in considering damages related to Title VI properties was how the court should determine preservation values. The parties commissioned independent appraisals to obtain fair market value. HUD allowed the owners up to 110% of the Government's appraisal. If the owners' appraisals were within 110% of the Government's, HUD accepted the private appraisals. If the private appraisals were higher than 110% of HUD's, the parties would negotiate values.

If the parties could not reach an agreement, they could seek binding appraisals from independent third parties. A government witness testified that the policy of the office that processed Carabetta's applications was to avoid third-party appraisals by negotiating diligently with owners. Tr. at 699–700. A HUD appraiser testified that he did not recall that office ever resorting to a "third-party" appraisal. Tr. at 700.

At the time of breach, Carabetta and HUD had not agreed upon a value for the Village Park properties. Plaintiffs' expert explained how the appraisal process would have proceeded in absence of agreement on an appraised value:

> There was ... a practical certainty that the owner would have taken up the HUD appraisal and scrutinized it for what we will call reversible errors, fact-based findings or conclusions that the HUD appraiser had reached, which upon examination, are not sustainable. And the owner would have put back to the HUD appraiser a letter, probably from the owner's appraisal ... that said, we have observed the following things to be wrong with your appraisal; do you agree or not agree.

Tr. at 113–14. Carabetta contended that the process would have continued and the appraisers would have generated new calculations of the property's value. When the new calculations were within the 110% range, HUD would have agreed.

Defendant's expert testimony was not inconsistent with plaintiffs', but it carried a slightly different emphasis. The expert commented at trial that three possible outcomes arose when the owners' appraisal exceeded 110% of HUD's: The owners could accept an appraisal within 110% of defendant's; the parties could reach an agreement by moving closer together; or they could call in a third party whose appraisal would be binding. Tr.

---

5. None of these properties appeared by name on Schedule D of the Repayment Agreement. Schedule D lists the mortgagors, the project names, and the project numbers. Normally, the names of the mortgagors and the projects were the same. For example, Stoneycrest Towers Realty owned Stoneycrest Towers. Village Park I Realty was called Bella Vista I on Schedule D, however, and Village Park II Realty was Bella Vista II. We discuss the Southford Park property later in this Opinion.

at 510–11. We have seen that independent appraisers were rarely used, if ever.

We understood at trial that appraisal differences typically would have resulted in lively and aggressive negotiations between the parties, but normally they were successful in reaching accommodation.[6] The Government argued that we cannot know what adjustments would have been made to the appraisals in the but-for world. It advocated "splitting the difference" by declaring the preservation values of Title VI properties to be an average of the appraisals. This approach has surface appeal, though it does not account for the ten percent margin allotted to owners pursuant to Title VI. However, defendant's approach is preferable to plaintiffs' assumptions that HUD's "reversible errors" would have caused it to accept Carabetta's numbers without negotiation.

### An Example

The following example assumes an initial HUD appraisal of $900,000 and an owners' appraisal of $1,200,000. Plaintiffs' would be at more than 133% of HUD's appraisal—well beyond the 110% margin. The parties would negotiate, each finding errors perhaps, and each eventually giving up $100,000. HUD's revised appraisal would be $1 million and the owners have moved to $1.1 million; the parties would be 110% apart. Now, HUD likely would accept the owners' appraisal.

Defendant's suggestion that we use the average or midpoint between the original appraisals would result in a $1,050,000 loan. Plaintiffs seemed to argue, in the case of the Village Parks at least, that HUD would have accepted Carabetta's appraisal when HUD saw that its own appraisal contained "reversible errors." In that event, plaintiffs would receive a $1.2 million loan based on their initial appraisal.

A reasonable appraisal in this example would be $1.1 million—the point at which the owners' revised, negotiated appraisal moved to within 110% of HUD's. The parties' ex-

perts supported this approach. Plaintiffs' expert stated that HUD would have agreed when the new calculations were within the 110% range. Defendant's expert testified that the parties would reach agreement by moving closer together.

### Village Park Properties

Plaintiffs' argument seemed to be that they could have convinced HUD to accept their appraisal by pointing out "reversible errors" in the Government's appraisal of the Village Park properties. Tr. at 355; Supplemental Appraisal Review Rpt. of Peter F. Korpacz at 35, June 18, 2004. That is, Carabetta took issue with HUD's appraisal techniques and argued that they could have convinced the Government to relent without further discussion. Carabetta complained that HUD's appraiser focused on a rash of thefts that had occurred near the Village Park properties six years earlier. They felt that HUD used inappropriate comparables for the appraisal because the appraiser did not consider high-rise buildings, like those at Village Park. The HUD appraiser also disregarded the advice of a local real estate broker who suggested that the properties' rent potential was higher.

### 1. High Crime Area

Plaintiffs objected to the impact that considerations of crime might have had on the appraisals. The narrative portion of the HUD appraisal mentioned crime at the property and described notable rates of crime in the general vicinity. Korpacz Rpt. at 36. Plaintiffs argued that the HUD appraiser gave this issue too much weight. They pointed out that the rash of thefts at the properties had occurred six years before and that the source of the problem had been the theft of a set of master keys—a problem that long ago had been remedied. Plaintiffs also argued that the properties are insulated from other crime in the vicinity by an adjacent golf course. Although the HUD appraisal men-

---

**6.** Carabetta employed a company called Recap as a consultant to complete capital loan applications and negotiate with HUD. Recap's owner was Mr. Smith, who testified as an expert for plaintiffs about Recap's experience processing Title VI properties. Mr. Smith handled at least twenty-five property reconciliations and was unsuccessful only once in "sustain[ing] the owner's appraisal." Tr. at 116. Recap's overall rate of sustaining owner appraisals was more than ninety percent, according to Mr. Smith. *Id.*

tioned the criminal activity, the appraiser did not reduce the appraisal value because of it.

### 2. Comparables

Plaintiffs took issue with the HUD appraiser's reference to and selection of comparable properties. Appraisers use one or more of three valuation methods according to standard appraisal practices: the cost approach, the sales comparison approach, and the income approach. Tr. at 334–35. The cost approach considers the value of the land and the depreciated value of any improvements. Tr. at 335. Appraisers using the sales comparison approach consider the sale prices of similar properties and then project the sales price of the subject property, taking into consideration differences between the subject and comparable properties. *Id.* The income approach requires appraisers to capitalize the income that the property is likely to generate for a period of years. *Id.* Appraisers often use more than one method, where sufficient information is available to do so, then compare the resulting values.

The HUD appraiser used the sales comparison method and the income approach. He compared the Village Park properties to nearby properties. None of these properties was a high-rise apartment, as Village Park I and II are, but instead were garden apartments and "mid-rises." Tr. at 357. Plaintiffs' appraisal reviewer testified that use of the sales comparison method was inappropriate because no similar buildings were nearby. Tr. at 359–60. The owners' appraiser used only the income method for this reason.

### 3. Local Opinions

The HUD appraisal made reference to comments of a local real estate broker who estimated that the properties would command $525 per month for efficiency units; $625 per month for one-bedroom units, and $725 per month for two-bedroom units, at market rates. Korpacz Rpt. at 38. The HUD appraiser estimated Village Park's rents as $500 per month, $575 per month, and $695 per month respectively, despite the local broker's opinion. *Id.* Plaintiffs objected to this, but they made no attempt to contact the local broker to assess his credibility or the bases of his opinions. Such factors might have influenced the weight that the HUD appraiser attributed to a local broker.

### Tilt to Plaintiffs

The ten percent margin would have given the owners a slight "advantage" as the parties moved toward each other in equal increments.[7] However, Carabetta's issues with HUD's appraisal techniques did not convince the court that the Government would have given in to plaintiffs' numbers without further discussion. A government expert did not believe that HUD would have adjusted its appraisals of the Village Park properties unilaterally. Moreover, this result would have been inconsistent with testimony from both sides that the parties engaged in lively negotiations to bring divergent appraisals within the acceptable range.

Purported inaccuracies in HUD's appraisal would not have caused HUD to act out of character by increasing its appraisal unilaterally to within 110% of Carabetta's. The parties would have reached agreement when up and down movement by the parties caused plaintiffs' appraisal to approach 110% of defendant's. Counsel stipulated damages based on the court's rulings on various issues and provided software to calculate their values. The software may not take into account the effect of the ten percent margin, but defendant's suggestion that we use an average or midpoint between the initial appraisals is close to the procedures discussed by both parties at trial and favored by the court.

### B. Title II Properties (ELIHPA)

The valuation process for capital loans under Title II was different from the process described under Title VI. Owners would commission appraisals that they submitted to HUD as part of the properties' Plans of Action. HUD would either commission a third-party appraisal, as it could under Title VI, or perform desk reviews of the owners'

---

7. Plaintiffs' approach as described at trial is close to the court's preferred calculation as well, but they have taken the position that reversible errors in HUD's appraisal would have caused HUD to accept Carabetta's initial appraisal. This would not have happened. We cannot use plaintiffs' damages calculation if their software assumed that HUD would have accepted Carabetta's initial appraisal.

appraisals. If HUD chose to conduct a desk review, it would then issue a Plan of Action preliminary approval letter. This Letter usually proposed reducing the preservation value.

Plaintiffs characterized the preliminary approval letters as offers to the owners. Tr. at 118. Carabetta contended that they would not have agreed with HUD's lower proposal, but would have advocated and obtained higher preservation values. Plaintiffs argued that the appropriate preservation value for each unfunded Title II property was mid-way between their appraisal and the amount proposed in HUD's preliminary approval letter.

The Government argued that Carabetta would not have convinced HUD to increase preservation values over the numbers contained in the preliminary approval letters; the preliminary approval letters would have been the final word. The Government directed our attention to Carabetta's actions with respect to the seven properties that did receive capital loans. Also, plaintiffs received loans under Section 241(f), a different Title II program.

Carabetta accepted the preliminary approval letters for the properties that received capital loans. Plaintiffs argued that their acceptance in those instances does not show what would have occurred in the but-for world. A HUD Preservation Letter specified that only $25 million was available for the seven properties, an amount that was not sufficient to cover the entire value. Plaintiffs therefore had no reason to challenge the preliminary Plans of Action once the proposed values exceeded $25 million. The Letter also instructed that the $25 million would be available only if the application and reconciliation process were completed by a date certain. Plaintiffs argued that it was more important to complete the process before the deadline, even if that meant accepting lower loan amounts than plaintiffs believed were justified.

Plaintiffs obtained mortgages for eight properties under Section 241(f), the other Title II program. For the most part, they did not contest these valuations. The Government argued that Carabetta's actions with respect to these loans was additional evidence that plaintiffs would not have challenged the preliminary approval letters for Title II capital loans. However, Section 241(f) loans were "honest to goodness mortgage[s] [with] monthly payments, [and a] market rate of interest ... made by a bank with [Federal Housing Administration] insurance," according to plaintiffs. Tr. at 129. Debt service factors controlled the size of each Section 241(f) loan. If the valuation presented in a preliminary Plan of Action were equal to or greater than the cap, the owner would have had no reason to challenge the preliminary Plans of Action. For example, a property owner would have had no incentive to contest whether a property's value was $550,000 or $600,000 if the bank would lend no more than $500,000.

Plaintiffs argued that their actions with regard to Section 241(f) loans do not show whether Carabetta would have accepted HUD's appraisals in the but-for world. The preservation value of the property would have determined plaintiffs' annual dividend, however. They had an incentive to argue for higher preservation values despite the debt service limitations. Tr. at 507–08.

Plaintiffs did not show acceptance of the preliminary Plans of Action by posting them on-site at the properties, or taking other steps required by the regulations. Nonetheless, the Government retained far more control with respect to preservation values under Title II than with Title VI. Plaintiffs' acquiescence regarding the Section 241(f) program suggests that they would have accepted the preservation values contained in the Title II preliminary Plans of Action.

### Disbursement Schedule

The parties disputed when HUD would have disbursed the capital loans to plaintiffs. The timing of the loans is important because an earlier receipt would have increased their value to Carabetta and thus boost plaintiffs' damages. Carabetta proposed an earlier date for receipt of the loans in the but-for world, while HUD believed plaintiffs would have received the loans later.

Plaintiffs contended that the timing of the receipt of the loans was governed by Preservation Letter 97–3A, which revised the capi-

tal loan agreement, granting plaintiffs fifty percent of the equity upon closing. The remaining fifty percent was to be held in escrow until all repairs were completed to HUD's satisfaction. The breach occurred on January 24, 1997 when HUD issued Preservation Letter 97–3. *See Carabetta Enters.,* 58 Fed.Cl. at 569. That Letter listed the properties that HUD would not fund. HUD claimed that Preservation Letter 97–3 governs because that Letter was in effect on the day of the breach. Preservation Letter 97–3 provides that Carabetta would receive no distribution until all the HUD-required repairs were completed. Defendant argued that we cannot consider 97–3A, giving the owners fifty percent of the loans at closing, because HUD issued it after the breach in February 1997.

This court may look to post-breach evidence where it would more fully establish a party's expectation damages. *Castle,* 48 Fed. Cl. at 207 n. 16; *see also Energy Capital Corp. v. United States,* 302 F.3d 1314, 1330 (Fed.Cir.2002) (noting that the "rule [that damages are to be assessed at the time of the breach] does not apply ... to ... expectancy damages that, absent the breach, would have accrued on an ongoing basis over the course of the contract"). The funded properties received capital loans according to Preservation Letter 97–3A. Carabetta closed on the seven funded properties in April 1997. These properties received fifty percent of the loans at closing and the balance upon completion of repairs as required by Preservation Letter 97–3A. HUD would have followed the same procedure had there been no breach.

### Repayment Date of the Loans

Carabetta claimed that loans for the unfunded properties would have become due fifty years after closing. HUD countered that the repayment dates would have coincided with the due dates for the underlying mortgages. The capital loan commitment agreement states,

> upon payment in full of the first mortgage if, *in the sole discretion of the Secretary,* the physical and financial condition of the project so warrant and the Mortgagor has shown a commitment to enhancing the quality of life of the tenants and the sur-

rounding community, the term of the Note *may* be extended so that the entire principal of the Note becomes due upon expiration of the Use Agreement executed in accordance with Paragraph 25 hereof

(emphasis added). HUD had discretion whether to extend the loans. The issue, however, is whether HUD likely would have extended the loans in the but-for world.

HUD Preservation Letter 97–3A directs that "the Capital Loan *will be extended* to be coterminus with the Use Agreement, if at the time the first mortgage is paid off, [HUD] determines [that the owner has met certain conditions]." HUD Preservation Letter 97–3A, Feb. 18, 1997. HUD Preservation Letter 97–3A was issued as an amendment to Preservation Letter 97–3, after the Government's breach. HUD issued such letters to its field offices to communicate policies and procedures. The policy letters are not binding law, but in this case they suggest that HUD had decided to extend the loan periods if the owners met certain conditions. It is reasonable to conclude that the Hartford field office would have extended the loan periods so long as plaintiffs met the specified conditions.

The parties did not dispute that plaintiffs had every reason to meet the specified conditions. Plaintiffs' expert testified that "[t]he choice is between having to pay it all in cash, as of a date certain, or having its repayment deferred without interest for somewhere between 33 and 38 more years. So, the incentive to do so is very substantial." Tr. at 145. Defendant's expert agreed that if "HUD would have been obligated to extend the term if these conditions were met, I don't have any doubts that the owners would have been able to meet those conditions. I think that is a very reasonable assumption to make." Tr. at 523. The expert thought it important whether Letter 97–3A was a legal commitment. If so, "the Title VI properties would then have a 50–year term, and those capital loans would not be due and payable until 2047." Tr. at 524.

This issue is not whether Letter 97–3A legally binds HUD, but whether HUD would have exercised its discretion to extend the loans. Testimony at trial showed that HUD would have exercised its discretion to extend

the repayment dates for the Title VI loans to fifty years from the date of closing.

### Increased Limited Dividends

The loan agreements authorized plaintiffs to extract an annual limited dividend. The term "limited dividend" in this context was used to mean the owners' right to withdraw some of the equity that had accumulated in their property. This dividend could not exceed eight percent of the owners' preservation equity. Authorization of the dividends also allowed owners to charge rents sufficient to generate such dividends. This presented the question at trial whether the market would have permitted the increased rents.

Plaintiffs' expert calculated the average rent increase for each property, then compared them to fair market rents of properties in a percentile somewhat below the market average in the same metropolitan statistical areas. The average rents for the Carabetta properties were two-thirds those of comparable properties at the market rate. In other words, the Carabetta properties were a substantial bargain. This suggested that occupancy would have remained high and the properties would have generated rent sufficient to support the increased limited dividends.

### Repair and Reserve for Replacement Components

Repair and Reserve for Replacement Components of the properties' equity were available to fund necessary improvements to the rental properties. HUD identified necessary repairs and replacements as part of its Preservation Capital Needs Assessments. HUD could direct a sub-component of its direct capital loans to a property's Reserve for Replacement Account if it found that the existing account was insufficient. Owners' contributions to a Reserve for Replacement Account were "eligible expenses" that would have been passed along to tenants as higher rents.

Plaintiffs argued that the repair component would have conferred a benefit in the form of increased property values and that this benefit should be added to their damages on a dollar-for-dollar basis. Plaintiffs' counsel noted that renovating the kitchen in one's home provides both an immediate, functional benefit and increased property value. Thus, a $5,000 repair or replacement would create a dollar-for-dollar increase in the value of the property.

The immediate benefit of a new kitchen accrues to the tenants, not to the owner. An increase in the property's value would be recognized only upon sale. Plaintiffs' damages calculations are based on the assumption that the owners would retain the properties until 2047. Increased value stemming from repairs and replacements would have depreciated by then. Plaintiffs did not present evidence of the values of repairs upon resale.

Funding repairs with the repair component would not have affected plaintiffs' dividends. The dividends were limited. Repairs could have affected dividends only if the owners had funded them with operating income. This might have had the effect of delaying payment of the dividends, but plaintiffs presented no evidence to suggest that this would have occurred. Plaintiffs' expert agreed that the properties were in good repair.

Plaintiffs would not have had access to the reserve accounts because the funds were placed in escrow at closing. Disbursements would have been made in amounts necessary to cover the costs of repairs. The repair component would have had a negligible effect on Carabetta's cash flow, as the owners would have held the money only long enough to pay the contractor or supplier. The same would have been true of the reserve for replacements.

### Credit for Sale of Unfunded Properties

Plaintiffs would have received Title II or Title VI loans for the properties at issue in the but-for world. They would have invested the loans and earned a return. That return represents the bulk of plaintiffs' damages from defendant's breach. In the real world, however, plaintiffs did not obtain loans for some of the properties, and in some cases they opted to sell the properties. Those sales generated gains that plaintiffs would not have realized absent the breach. Those gains were positive effects of the Government's breach, and they offset a portion of plaintiffs' damages. The parties agreed on

the need to offset such gains, but they disputed whether the offset should be net of income taxes.

Plaintiffs argued that we should calculate the offset post-tax, which would reduce the gains and result in higher damages for plaintiffs. The Government contended that we should offset plaintiffs' gains pre-tax, further reducing plaintiffs' damages. Defendant suggested that plaintiffs should be charged with the full amount of the gain because they could have avoided the tax by engineering a tax-free like-kind exchange of real property.

The Internal Revenue Code allows deferral of income tax liability on the sale of real estate through a like-kind exchange. *See* I.R.C. § 1031. "Under the like-kind exchange provisions, no gain or loss is recognized when property held for productive use in a trade or business or for investment is exchanged solely for like-kind property that is also held for productive use in a trade or business or for investment." 3 *Mertens Law of Federal Income Taxation* § 20B:01.

The Government's argument that plaintiffs should have engaged in a like-kind exchange to avoid tax liability is similar to an affirmative defense of mitigation. That defense may have been waived because defendant did not include it in the Answer or other pleadings. Plaintiffs did not address this argument other than to object to the Government's offering it.

Mitigation would require that Carabetta have taken reasonable steps to avoid further damage from the breach. However, the non-breaching party must be capable of mitigating its damages "without undue risk, burden or humiliation." *Restatement (Second) of Contracts* § 350. To qualify for a like-kind exchange, property must have been "held for productive use in a trade or business or for investment [and] exchanged solely for like-kind property that is also held for productive use in a trade or business or for investment." 3 *Mertens* § 20B:01. We did not have evidence that plaintiffs had reasonable opportunities for tax-free exchanges that would have been appropriate or economically advantageous at the time. Without sufficient evidence on this point, a ruling whether plaintiffs should have engaged in a tax-free exchange would be conjecture.[8] It does not seem reasonable to require that plaintiffs have anticipated the effect that their sale of properties might have had on the breaching party in calculating damages.

### Early Sale of Properties

The Government's loans to Carabetta would have become due in full when plaintiffs sold the properties that secured them. This would have deprived Carabetta of interest-free capital. The Government argued that Carabetta would have preferred to sell the low-income residential properties as soon as they could. Defendant contended that the owners therefore would have paid their loans off early had the Government made the loans in dispute. They would have paid the loans in full when they sold the mortgaged properties, and defendant sought credit for this possibility against plaintiffs' claimed damages.

The incentives established by LIHPRHA and ELIHPA shifted the balance of risk and opportunity toward retention of the properties. Indeed, it was developers' aversion to low-income housing that necessitated the passage of LIHPRHA and ELIHPA. Property owners would have benefitted more from retaining the properties and having the use of interest-free loans. Experts testified that retaining the loans as long as possible would have been the economically rational course of action. The Government did not show that Carabetta would have had a reason to act against their economic self-interest. Carabetta would have retained the properties for the life of the loans.

### Tax Gross–Up

■ The loan proceeds that the Government denied Carabetta would not have been taxed, but a judgment based on plaintiffs' loss of the proceeds normally would be.

---

8. We recognize that plaintiffs must prove that all their claimed damages were caused by the breach. The parties did not argue whether plaintiffs' decision not to engage in a tax-free exchange created a failure of proof in this respect; that is, that a part of their damages were caused not by defendant's breach but by plaintiffs' not having engaged in better tax planning. Such a ruling would penalize plaintiffs on a highly speculative basis.

Carabetta argued that the portion of their damages that corresponds to the lost loan proceeds should be "grossed-up" to account for the taxes. This would place plaintiffs in as good a position as they would have been absent the breach, they contended. The damages that Carabetta seeks do not correspond to loan proceeds, however. The court must calculate Carabetta's damages by considering the reasonable return that Carabetta could have earned on the loan proceeds. That return would have been taxable income.

Plaintiffs were not seeking an order directing HUD to issue interest-free loans for a specified period. They asked the court to give them the benefit of their bargain. The bargain was that the Government would have disbursed the loan proceeds interest-free. Carabetta would have invested or leveraged the loan proceeds to earn a return, then repaid the loan when the note became due. The value of interest-free loans to Carabetta was a reasonable return on the loan proceeds, not the proceeds themselves. Returns on the loan proceeds would have been taxable income to plaintiffs.

Carabetta's counsel likened plaintiffs' expected return on the loans to life insurance proceeds, which are not taxable. The owner of a life insurance policy may earn a reasonable return on the proceeds he receives, but the difference is that he keeps the principal amount as well. A borrower may keep only the return on proceeds earned while the loan was in place. The borrower must repay the principal, even if the loan is interest-free.

Plaintiffs cited cases to support their argument that damage awards should be grossed-up where the non-breaching party had bargained for a post-tax benefit. *See, e.g., Home Sav. of Am., F.S.B. v. United States,*

57 Fed.Cl. 694 (2003), *aff'd in part, vacated in part,* 399 F.3d 1341 (Fed.Cir.2005). The damages sought in those cases were for funds or benefits that the plaintiffs would have retained in addition to any return they might have earned on the benefits. None involved loans. The plaintiff in *Home Savings* sought breach of contract damages resulting from legislation that deprived it of favorable regulatory accounting treatment. *Id.* at 729–31. It had to raise capital that it otherwise would not have needed as a result. *Id.* [9]

Carabetta's claim for damages is measured by the loan proceeds, plus the present value of a 12.5% return over the life of the loan, minus the principal repayment. The benefits that Carabetta could have expected from defendant's full performance would have been income subject to taxation, as the damages to which they are entitled will be. A tax gross-up of the damages award would overcompensate plaintiffs in these circumstances.

### Southford Park

Southford Park is unique among Carabetta's unfunded properties. It is the only property that had secured a flexible subsidy loan from HUD under Section 221(d)(3) of the Housing Act. A July 1983 Use Agreement between Southford Park and HUD obligated Southford Park "to operate the project in accordance with the provisions of Section 221(d)(3)" until 2010. The parties disagreed whether Southford Park nevertheless would have received Title VI or Title II capital loans and other incentives.

Plaintiffs contended that they would have obtained permission from HUD to place Southford Park on Schedule D of the Repayment Agreement and therefore failure to receive the loan for that property should be

---

**9.** *See also Oddi v. Ayco Corp.,* 947 F.2d 257, 267–68 (7th Cir.1991) (damages corresponded to losses stemming from defendant's inducing plaintiff to opt out of tax-deferred retirement plan); *Sosa v. M/V LAGO IZABAL,* 736 F.2d 1028, 1033–34 (5th Cir.1984) (damages corresponded to future earnings and were grossed-up to account for taxation of interest earned on the judgement amount); *DeLucca v. United States,* 670 F.2d 843, 846 (9th Cir.1982) (damages awarded were death benefits and were grossed-up to correspond to income taxes paid as a result of investing the benefits); *Beggs v. Dougherty Overseas,*

*Inc.,* 287 F.2d 80, 83 (2d Cir.1961) (damages were grossed-up to correspond to the loss of a tax advantage for foreign employment); *Anchor Savings Bank v. United States,* 59 Fed.Cl. 126, 135 (2003) (damages corresponded to beneficial regulatory accounting treatment); *First Nationwide v. United States,* 56 Fed.Cl. 438, 449 (2003) (damages corresponded tax deductions for sales losses); *Shaw v. Sec. of Dep't of Health & Human Serv.,* 18 Cl.Ct. 646, 654 (1989) (damages corresponded to future earnings and were grossed-up to account for taxation of interest earned on the judgement amount).

included in their damages award. Defendant argued that Southford Park never was a Schedule D property and the court cannot know that it would have been added. The issue is whether in the but-for world, Southford Park would have been permitted to leave the Section 221(d)(3) program, making it eligible for the direct loans under Schedule D of the Repayment Agreement.

Preservation Letter 97–3 allocated $75 million to three categories of projects, including those "subject to a repayment or settlement agreement that was executed between the owner and the Secretary [of HUD] before September 1, 1995." Southford Park was not subject to a repayment agreement before September 1995 or any other time. The parties disputed whether Southford Park nevertheless would have been added to Schedule D after HUD and Carabetta entered into the Repayment Agreement. The Repayment Agreement referred to Southford Park in a footnote citing plaintiffs' claim of Southford Park's eligibility for listing on Schedule D. Paragraph 4 of the Repayment Agreement provided that HUD would process Section 241(f) applications for twenty-five projects on Schedule D. A footnote on page 8 of the Agreement stated, "Schedule D also includes a 26th project, Southford Park, which Carabetta is appealing to HUD to include as Section 241(f) eligible in light of HUD's current determination that it is not."

Plaintiffs asked that we look first at the 1983 Use Agreement and rule that it was not proper as a matter of law for HUD to have denied the owners' request to prepay Southford Park's mortgage, thus making it ineligible for the direct loan programs. This calls for an extra step in the context of this lawsuit. For plaintiffs to be successful, the court must rule that a footnote in the Use Agreement gave plaintiffs the right to cease operations under Section 221(d)(3) of the Housing Act. Having ceased operations under that section, Carabetta would have been permitted to transfer Southford Park to one of the new direct capital loan programs.

The parties negotiated the footnote in the earlier Use Agreement. Though Southford Park was to continue in the 221(d)(3) pro-

gram until 2010, the footnote provided that the owners could request permission to cease operations under that program before the Use Agreement expired. The footnote stated, "[t]he Commissioner will consider a request from the owner for permission to cease operations under Section 221–(d)3 of the National Housing Act. Under certain circumstances such permission will not be unreasonably withheld." Use Agreement, July 28, 1983. Carabetta asserted that the owners bargained for this footnote with respect to the Southford Park property so that HUD could not unreasonably withhold permission from Carabetta to pay their mortgage before 2010. Plaintiffs' expert termed the footnote "property specific." Tr. at 173. Defendant did not dispute plaintiffs' assertion that the footnote was negotiated by the parties.

Carabetta asked for permission to prepay the loan, but HUD denied it. Plaintiffs contended that Southford Park would have become eligible for capital loans under LIHPRHA and ELIHPA, if HUD had permitted them to prepay. Carabetta argued that the language in the footnote of the Use Agreement required that HUD demonstrate legitimate justification for denying Carabetta consent to prepay. HUD explained that Southford Park was ineligible for the capital loans because it had a flexible subsidy contract.[10] The HUD Handbook prohibited capital loans to projects covered by flexible subsidy loans on or after December 21, 1979, such as Southford Park. Letter from HUD to Joseph F. Carabetta, Jan. 25, 1995.

Plaintiffs responded that this was a circular argument because Southford Park's eligibility was barred by the flexible subsidy program only because HUD prevented Carabetta from leaving it. Such a rationale was insufficient because HUD's "blind adherence" to the agency handbook itself caused the problem and ignored the good faith requirement of the footnote. Plaintiffs argued that the specially-negotiated contract provision overrides a general policy stated in a handbook that lacks the force of law. Moreover, HUD had waived handbook provisions

**10.** This is the Section 221(d)(3) loan program     discussed above.

with respect to other Carabetta properties, according to plaintiffs.

HUD tried to show that Southford Park would not have been eligible for the capital loan program even if it had been released from the flexible subsidy program.[11] After the parties included the footnote in the Use Agreement, Congress passed special legislation that made it very difficult for owners to prepay their mortgages. Owners had to seek permission from the Housing Commissioner to prepay, for example. The Commissioner would entertain such requests only after the owners demonstrated that they had met various statutory requirements. Southford Park did not follow these procedures, according to defendant.

The Government emphasized that the footnote commanded only that HUD entertain the request, not that it grant the request. Also, the footnote did not obligate HUD to grant Carabetta permission to withdraw from the flexible subsidy program, but only to consider plaintiffs' request to prepay the mortgage. HUD did not violate the footnote because it considered Southford Park's offer to prepay, even if it denied the offer. The footnote Carabetta relied upon is so weak as to be practically meaningless. The Housing Commissioner has discretion in the footnote to grant permission, and in some instances permission would not be unreasonably withheld. This implies a requirement that the Commissioner have legitimate reasons for withholding permission, but it gives a court no standards to apply in reviewing the exercise of that discretion, a point the Government capitalized upon. The Government noted that the footnote prevented HUD from unreasonably denying permission to prepay *in certain circumstances*. This "lends itself to the reading that in other circumstances . . . [the Commissioner] may act with reason or with no reason [at all]." Tr. at 776. The

record contains very little evidence of whether the "certain circumstances" were conditions precedent or other limitations, or whether they occurred according to the proper procedures or timing, or whether they occurred at all.

The record of trial does not reveal clearly the Government's justification for denying plaintiffs' request to exit the 221(d)(3) program, and we have not considered whether this court has jurisdiction to address the matter. Carabetta has not shown that Southford Park would have been included on Schedule D even if the Government had granted such permission. The issues are related, but not connected legally. That is, if we could rule for plaintiffs that the Government *did* unreasonably withhold consent by not offering sufficient justification, we would have no way of knowing that Southford Park would have qualified for the direct loan programs. If they had qualified, we cannot know whether HUD would have allowed them to enter the direct loan programs.

Southford Park was not subject to the Repayment Agreement with HUD when the 1997 breach occurred. We cannot speculate that plaintiffs would have been permitted to add Southford Park to Schedule D of the Repayment Agreement if HUD had allowed Carabetta to prepay the Section 221(d)(3) flexible subsidy loan. If plaintiffs have remedies for being denied a transfer from Section 221(d)(3) to Titles II or VI, or for being excluded from the Repayment Agreement's Schedule D, they are beyond the reach of this lawsuit.[12]

## CONCLUSION

HUD employed different means of evaluating plaintiffs' properties under the Title II and Title VI loan programs. Title VI involved only two properties for our pur-

---

11. Defendant argued that the Use Agreement required the owners to operate pursuant to Section 221(d)(3) restrictions regardless of whether they prepaid their mortgage. Thus, even if Carabetta had been allowed to prepay, the Agreement required them to meet all restrictions until 2010. Plaintiffs made a reasonable argument that the phrase "cease operations" in the footnote overrules the explicit obligation to "continue to operate the project" until 2010.

12. The parties also argued whether Southford Park would have qualified for a Title VI loan or a Title II loan and we made extensive findings of fact on the matter. That issue is now beyond the scope of this Opinion, however because of the ruling that Southford Park must be excluded from plaintiffs' damages claim.

poses—Village Park I and Village Park II, Southford Park having been eliminated from consideration by this Opinion. The appraisal process for Title VI was more accommodating to the owners, in that HUD typically would accept their appraisal once it fell into a range that was no more than 110% of HUD's own appraisal. We found that the parties would have reached agreement on the appraised values that serve to calculate damages in this case. The process under Title VI favors plaintiffs slightly, but the values that would have been adopted for the Village Park properties are closer to the values proffered by defendant.

Title II was different in that plaintiffs had more leeway to propose their own incentives as part of a Plan of Action, but HUD could be more strict in its appraisal process. It would have performed desk reviews of the owners' appraisals, and then the desk reviews likely would culminate in a Plan of Action preliminary approval letter that proposed reducing the preservation value. The Government was less inclined to bargain with owners over a midpoint of values or to permit a "tilt" toward plaintiffs' numbers. Evidence suggested that plaintiffs would have accepted the preservation values contained in the Title II Plan of Action preliminary approval letters.

HUD Preservation Letter 97–3A and other evidence at trial showed that HUD would have extended the loans for the full fifty-year period. The extensions were conditioned only upon plaintiffs' having met certain specified conditions, and the parties did not dispute that Carabetta had every reason to meet those conditions. The repayment date for the Title VI loans would have been 2047.

The issue regarding timing of the loans' distribution is resolved by considering HUD's practice in the real world; that is, how the Government distributed the loans to the owners of seven properties that were fully funded. These properties received fifty percent of the loans at closing and fifty percent upon completion of repairs required by Preservation Letter 97–3A. HUD would have followed the same procedure had there been no breach.

Expert testimony at trial showed that Carabetta properties would have remained below-market bargains for tenants, even if rents were increased to accommodate increased limited dividends. Occupancy thus would have remained high enough for the properties to have generated rent sufficient to support the withdrawal of additional equity by the owners. Plaintiffs are entitled to include increased limited dividends in their calculation of damages.

Carabetta's claim for the value of Repair and Replacement components must be denied. These funds would have been held in escrow until needed; they would not have been available to plaintiffs for investment. Repairs would not have increased the value of plaintiffs' properties immediately or affected their cash flow, but would have benefitted only the tenants.

The Government argued that Carabetta would have sold the low-income residential properties as soon as possible, to avoid the restrictions that caused Congress to enact LIHPRHA and ELIHPA to begin with. This would have entitled defendant to a credit against damages. Carabetta would have retained the properties for the life of the loans, however. Early payout of interest-free loans would not have been an economically rational course of action.

Selling the properties would not have made economic sense in the but-for world, but in the real world Carabetta did sell some properties because they did not receive the loans. Those sales generated gains for which defendant is entitled to credits against damages because plaintiffs would not have realized the gains in the but-for world; they were positive effects of the Government's breach. Plaintiffs had little choice but to pay the taxes, and we concluded that the gains should be calculated post tax; that is, the net amount of the gain offsets plaintiffs' damages. The Government suggested that plaintiffs could have avoided the taxes through "like-kind exchanges." This argument did not take into account plaintiffs' tax status at the time and whether they would have found it practical to acquire other real property. We had no basis on which to assess such factors at trial, and we found defendant's

arguments that plaintiffs could have and should have structured their transactions to avoid tax liability to be speculative. Such an argument also resembles the affirmative defense of mitigation, which defendant did not raise prior to trial.

Carabetta argued that its award of damages should be "grossed-up" to account for taxes they must pay on the judgment. Only then would they be placed in as good a position as if they had obtained the loans. Carabetta is not seeking loan proceeds, however. Plaintiffs' suit arises from defendant's failure to provide them the loans guaranteed by the Repayment Agreement. Their losses are measured by the amount that Carabetta could have realized by investing or leveraging the loan proceeds to earn a return. The value of interest-free loans to Carabetta was the investment value of the loan proceeds. Investment income or interest income would have been taxed as a judgment will be. A tax gross-up is not appropriate in such circumstances.

Plaintiffs asked that we construe their 1983 Use Agreement with HUD to rule that HUD's denial of their request for early payment of Southford Park's flexible subsidy loan was improper. This calls for an extra analytical step in the context of this lawsuit. The contract that HUD breached is the 1995 Repayment Agreement. This Opinion measures plaintiffs' damages for the breach by calculating the amounts that Carabetta might have realized on the interest-free loans guaranteed to properties listed on Schedule D of that Agreement. Southford Park was not listed on Schedule D. The issue of whether it should have been so listed not only raises jurisdictional questions but also is beyond the scope of this case. The Use Agreement was not the basis of the breach. Even if we could hold that the Government unreasonably withheld its consent for Carabetta to prepay its mortgage, this would not necessarily result in Southford Park's having qualified for the direct loan programs.

Plaintiffs' total damages claim was $46,777,319. Their net award according to the calculator provided by the parties is $18,343,953, as show below:

| Plaintiffs' Claim | $46,777,319 |
| --- | --- |

| Issue | Amount Subtracted | Plaintiffs' Cumulative Damages |
| --- | --- | --- |
| Title VI | <$481,017> | $46,296,302 |
| Title II | <$2,889,861> | $43,406,441 |
| Repair and Reserve for Replacement Components | <$9,919,329> | $33,487,112 |
| Tax Gross–Up | <$10,110,900> | $23,376,212 |
| Southford Park | <$5,032,259> | $18,343,953 |
| **TOTAL JUDGMENT** | | $18,343,953 |

The Clerk of Court will enter judgment for plaintiffs in the amount of $18,343,953. No costs.